**STATE of Texas, Appellant,**

v.

**BUCKNER CONSTRUCTION COMPANY, Appellee.**

No. A14–85–130CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 5, 1985.

Rehearing Denied Jan. 16, 1986.

Delmar L. Cain, Asst. Atty. Gen., Austin, for appellant.

Robert S. Harrell, Roger Townsend, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

SEARS, Justice.

This is an appeal from a judgment for $840,000 entered against Appellant for claims made by Appellee in connection with its contract with Appellant to paint a number of bridges on state roads. Following Appellant's filing of its Motion to Appeal, Appellee filed a Motion for Penalty for Frivolous Appeal under TEX.R.CIV.P. 438. We affirm the judgment of the trial court and deny the Motion for Penalty for Frivolous Appeal.

Appellee, Buckner Construction Company (Appellee or Buckner), was low bidder on a project initiated by the State Department of Highways and Public Transportation (Appellant or State) to sandblast and paint twenty-eight bridges in Montgomery County for $404,800. At the same time, Buckner contracted for the same work on bridges in Brazoria County. That work is not the subject of this appeal. Buckner actually bid the job for another company, A-1 Painting and Sandblasting of Austin (A-1). Buckner signed the contract with the State on February 2, 1978 and then subcontracted the job with A-1 for a percentage of the contract price, as it had done with other subcontractors on numerous previous occasions. Ultimately four different subcontractors, at different times, worked on the bridges. As specified in the contract, the resident engineer for the state in Montgomery County was the final authority for the job. He then assigned an inspector to work at the job site. Four inspectors worked on this job at different times before its completion.

A-1 began work on the job in March of 1978 and, according to testimony for Buckner, began having trouble shortly thereafter when the State required a greater amount of sandblasting of the bridges prior to painting than A-1 believed was specified in the contract. Another immediate problem was that the paint the State required Buckner to purchase for the job was beyond its shelf life and had to be thinned excessively before it could be used, thereby requiring a greater amount of time and materials to mix and apply it. On three occasions, Buckner or the subcontractors returned the bad paint to a state warehouse and were supposedly given new paint; actually, some of it was also too old to be used. A-1 stopped work on the job in

July, 1978, citing financial difficulties caused by the bad paint and excessive sandblasting required by the job inspector. Buckner had made advances to A–1 prior to July hoping its problems could be resolved and the work continued. According to testimony from both A–1 and Buckner, morale was also a major problem, as the men on the job were unable to communicate with or get along with the state inspector.

Buckner filed a claim with the State for compensation of $26,586.58, the amount A–1 claimed it had to pay its employees for additional work days made necessary by the bad paint. Buckner also filed suit against A–1 for a monetary refund. That suit has not yet been tried, but at Buckner's request, has been maintained on the docket.

Highway Contracting (Highway) began working in August, 1978, as subcontractor on the job. The same complaints were forthcoming from Highway that had been made by A–1, and the friction accelerated between the second state inspector on the job, Damman, and Highway's supervisor and employees. They complained also that the inspector was not on the job during the hours they needed him to be there to inspect the sandblasting prior to final painting. Another inspector, Hineman, replaced Damman as inspector for several months in 1978; witnesses testified that they were able to communicate with him and that their work progressed more easily and more quickly. However, the state engineer did not agree with the inspection job performed by Hineman, and replaced him with the second inspector, Damman, who required that a significant amount of work finished under Hineman be sandblasted and painted again.

Buckner was forced during the period Highway worked on the job to advance it large sums of money to continue the work. In approximately July of 1979, Highway pulled off the Montgomery County job to work exclusively in Brazoria County, citing its precarious financial situation caused by the frequent problems with the State. During the time Highway was on the job and the interim period before the company failed, employees of Buckner, Highway, and the State met on several occasions to discuss their problems. One of Buckner's officers admitted at one point that they might not have understood the specifications completely from the beginning but had decided to cooperate with the State and meet its greater expectations concerning the sandblasting. During the course of the work on the project Buckner subcontracted with C & J Painting Co., whose employee testified to the same kinds of problems the other contractors encountered concerning the sandblasting and inspections.

It is apparent from the record that Buckner and the subcontractors believed the lack of practical experience of all the state inspectors, but principally Damman, and that of the engineer, Holzwarth, contributed to their inability to agree on the contract specifications. The contract specified that all work on the bridges was to be accomplished under the supervision of the project engineer, who was to referee all disputes arising under the contract and to have the final decision concerning them. The contractor was obligated to renew or repair any defective part of the construction at its own expense.

For several months during two different time periods, no subcontractors worked on the Montgomery County job at all, though Buckner continued to seek work for itself and other subcontractors in other parts of the state. Highway Painting completely pulled off the job in December, 1979, owing Buckner approximately $950,000. Buckner released Highway from any claims against it, stating that the company was destroyed because of the unfair demands placed on it by the State. Some of Highway's employees became Buckner's employees and subsequently worked on the bridges. Buckner purchased from Highway some of the equipment Highway had bought to complete the job with money advanced it by Buckner.

The record reflects that the state engineer, Holzwarth, as well as the inspector, Damman, believed the subcontractors did not meet the stated specifications in their work and continued other practices such as

failing to blow dust off a surface before painting it. Additionally the State cited instances of equipment breakdowns, manpower shortages, and inability to adequately communicate with the job supervisors. There was general agreement among Appellee's witnesses that following the removal of Mickey Damman for the second time, a fourth inspector, Nelson, was installed, and under him the work accelerated and conditions improved until the job was completed and accepted in October, 1980.

Buckner filed a second claim with the State on November 24, 1980 for compensation for additional working days. A Highway Commission Minute Order was issued May 20, 1981 awarding Buckner $26,586.58, the amount of its first claim for time delay experienced by A–1 subcontractors because of the bad paint. The State denied the remainder of the claim. However, the first amount was not paid until October 10, 1984, *one week before trial.* The State also paid at that time the retainage it had kept from Buckner during the job and a refund for the unused paint Buckner sold back to the State.

Buckner brought suit against the State for $1,190,625.24 in damages, $19,180.00 for penalties assessed against it, $7,249.30 for unpaid retainage, $3,828.36 for bad paint returned and the $26,586.58 for the first claim. The court entered judgment upon the jury's verdict that the resident engineer acted in an arbitrary and capricious manner in requiring a greater amount of sandblasting than was required in the specifications, in providing bad paint, and in maintaining inspectors on the job who were unsuitable for it. This conduct was based on his partiality, misconduct, and gross error. The jury awarded Appellee $840,000 compensation for damages suffered and found that Appellee had not waived its right to additional compensation by its own acts or omissions. The State filed a Supplemental Brief with this court following Appellee's Motion for Penalty for Frivolous Appeal. In it the State adds five additional points of error and responds to Appellee's motion.

■ Appellant presents ten grounds of error on appeal. In the first two points, it argues that the trial court erred in overruling its motion for an instructed verdict because there was no evidence or insufficient evidence that the engineer, Holzwarth, acted arbitrarily or capriciously in settling any dispute under the contract or based any decision on partiality, misconduct or gross error.

The standard of review for an insufficiency of the evidence complaint is whether the evidence supporting the finding is so weak or the evidence to the contrary so overwhelming that the finding is manifestly unjust; if it is, it should be set aside and a new trial ordered. The appellate court must review all of the evidence in the record to reach its decision. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate,* 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951); *J.M.R. v. A.M.,* 683 S.W.2d 552, 554 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.). It is the jury's function to determine the credibility of the witnesses and the weight to be given their testimony. *Leyva v. Pacheco,* 163 Tex. 638, 641, 358 S.W.2d 547, 549 (1962); *Stine v. Stine,* 590 S.W.2d 627, 630 (Tex.Civ.App. —Houston [1st Dist.] 1979, no writ); TEX. R.CIV.P. 226a. The jury may accept all or part of the testimony of any witness, and the number of witnesses who testify to a certain fact is not controlling. *Royal v. Cameron,* 382 S.W.2d 335, 339 (Tex.Civ. App.—Tyler 1964, writ ref'd n.r.e.).

In reviewing a complaint of "no evidence" to support the finding, the appellate court must consider "only the evidence and inferences tending to support the finding and disregard everything contrary to it, viewing them in the light most favorable to support the finding." The point of error must be overruled if there is any evidence of probative force to support it. *Transport Insurance Co. v. Mabra,* 487 S.W.2d 704, 707 (Tex.1972); *In re King's Estate,* 244 S.W.2d at 661; *Jack Roach Ford v. De Urdanavia,* 659 S.W.2d 725, 728 (Tex.App. —Houston [14th Dist.] 1983, no writ).

Under either review standard, this record is replete with evidence to support the jury's verdict. The State admits that it can be held liable if the actions of the resident engineer are based on fraud, misconduct or gross mistake, thereby rendering them "arbitrary" or "capricious." *See State v. Martin Bros.*, 138 Tex. 505, 160 S.W.2d 58, 61 (1942); *Goodrum v. State*, 158 S.W.2d 81, 86–87 (Tex.Civ.App.—Galveston 1942, writ ref'd w.o.m.). Among the numerous items of supporting evidence is that neither Holzwarth nor his inspectors had previous experience in inspecting the sandblasting and painting of a bridge. Further, numerous witnesses for Appellee testified that the inspectors were frequently not on the job when needed. Because the bridges could not be painted until the sandblasting was inspected, it frequently happened that the freshly blasted steel rusted before it was inspected and the area had to be sandblasted again prior to painting. Buckner repeatedly complained about the inspector's failure to be there when needed; Holzwarth, the engineer, testified that he agreed with Damman's hours on the job and maintained the inspector should remain in contact with the job supervisor "and make himself available at whatever times he thought was necessary."

The employees of each subcontractor on the job complained vigorously about their inability to communicate with the inspector, Damman. Their complaints ranged from the fact he referred to them or called them by derogatory names to treating them as less than human. Holzwarth's testimony concerning Damman's behaviour was that the names he used were not necessarily degrading and were actually colloquialisms with which the employees, many of whom were from Greece or the northern United States, were unfamiliar. Holzwarth admitted at one point to Buckner that he "didn't want this job in the first place", that he was short of inspectors and needed Damman's help. He replaced Damman with Hineman for several months, then fired Hineman from the job and replaced him with Damman again. It was not until Damman was replaced with Nelson in November, 1979, that the crews were able to work satisfactorily with the inspector.

The problem concerning the amount of sandblasting required by the State was the most egregious. The contract required that the bridges be cleaned to either a brush-off blast standard or a near-white blast standard according to the type of paint to be applied. Concerning the bridges worked on by A–1, the specifications called for a "brush-off blast" in which the surface must be free of dead or chalky coatings, and only tightly adhering mil scale, rust or coatings are allowed to remain. Such coatings are considered "tightly adhering" when vigorous brushing with a wire brush results in a polishing of the surface rather than removal of the coating. From the beginning of the job, the crew and the inspector disagreed on the quality and quantity of blast required. Appellee's witnesses testified the inspector made them remove coatings that were tightly adhering. A state official who was requested to inspect the problem applied to the bridge a piece of strapping tape which had flakes of paint on it when he pulled it up; thus he concluded the paint on the bridge was dead paint that needed to be removed. Such a "tape test" was not in the specification.

A "near-white blast cleaning" renders the surface such that 95% of every square inch of the surface is free of visible residues. The remainder can have light shadows and slight streaks or discolorations caused by the slight stains from coatings that may remain. This standard was used on bridges in poorer condition. Witnesses claimed the State required a White blast, in which the surface is 100% clean, instead of the near-white blast called for in the specifications. There were numerous discussions between State employees, Buckner and the subcontractors concerning the requirements of a near-white blast. Appellees complain they frequently were required to blast the same area many times to satisfy Damman, even beyond a white metal blast. Damman also scraped freshly blasted metal with his pocket knife, then instructed the crew to make the entire bridge, including the unexposed areas,

shine like the scraped portion. This was an unreasonable and impossible requirement. When Damman replaced Hineman as inspector, he inspected the bridges which had been blasted and painted under Hineman by scraping off the paint with his knife in spots all over the bridge; as a result, much of the work done on those bridges had to be done again. Apparently Holzwarth was on vacation when Damman decided the bridges had to be redone. There is no evidence that Holzwarth personally viewed these bridges, though he subsequently defended Damman's decision and maintained that the sandblasting crew didn't adequately clean the surfaces according to his interpretation of the specifications. Holzwarth testified that in the instance where Damman required the crew to re-do much of the work accepted by Hineman, the matter should be brought to the engineer, who would make that decision.

The poor quality of the paint which Buckner was required to purchase from the State was the first problem the paint crew encountered. It was beyond its shelf life and required excessive thinning before it could be applied. The crews described it as resembling mud or peanut butter. Then an excessive number of coats of paint was necessary, requiring a great deal of movement of the crew and its equipment. Holzwarth and the inspectors provided for the return of this paint to a State warehouse and the substitution of new paint. However, approximately one-third of the "new" paint they used still required extra thinning. One of the painters took the paint to the head of materials and testing for the State, who was unable to mix it even with a large drill press motor. Holzwarth admitted that he never saw any of the bad paint, and he did not see the test report. However, he still refused to admit that poor quality paint was used on the job. The paint crews had to use at least some of the bad paint throughout the job.

Testimony at trial from Buckner's witnesses included the two men who owned the company, sandblasters, painters and supervisors who worked for the subcontractors, experts, Holzwarth and other state employees. The State did not call any of the four inspectors who worked on the job, nor either of the two State Highway Department experts who advised Holzwarth and the inspectors. They offered no explanation for their failure to call witnesses who had direct information of the facts surrounding this lawsuit.

It is true, as the State points out, that the engineer's decision under a contract like this is presumed to be correct and to have been made within the scope of his authority. *City of San Antonio v. McKenzie Construction*, 136 Tex. 315, 150 S.W.2d 989, 996 (1941). Such a decision cannot be set aside for fraud, misconduct or gross mistake by evidence that another engineer would have reached a different decision or simply on a conflict of evidence as to what he ought to have decided. His decisions must have implied bad faith or failure to exercise an honest judgment. *Id.* Neither Buckner nor the State presented evidence that another engineer would have reached differing conclusions concerning the problems on the job. Moreover, the evidence was sufficient to show more than a mere conflict of evidence between the State and Buckner. As the sole judge of the credibility of witnesses, the jury was presented with sufficient evidence to support its findings. We overrule the first and second points of error.

■ In the third and fourth points of error, the State alleges trial court error in admitting, over proper objection, Buckner's Exhibits 75–88 and 89 because Buckner failed to establish a proper predicate for them and because the underlying records were inaccurate, incomplete, and not based on the witness' personal knowledge. Evidence is admissible unless proper objection is made to it in timely fashion at trial. TEX.R.EVID. 103(a); *See Clark v. Walker-Kurth Lumber Co.*, 689 S.W.2d 275, 281 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *Hovas v. O'Brien*, 654 S.W.2d 801, 803 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). The record reveals that these exhibits were admitted without objection. With reference to No.'s 86–88, the payroll records, the State stated that it

had "no objection" to their admission. As to Exhibits 75–85, journals and ledgers, the State's objection was based on its desire to have the underlying invoices admitted as well. When assured by the court that it would have the opportunity to examine the invoices, the State replied that it had "no objection to their admission" and "no objection based upon business records proof." Exhibit 89 was the summary prepared solely from Exhibits 75–85 and was admitted into evidence over the State's explanation that "our objection is merely contingent upon not receiving the documents," referring to the checks and invoices underlying Numbers 75–85. The State never filed a motion to compel production of the checks and invoices at trial, although it claims it did make a request to produce all written documents, diaries and memoranda used by Buckner in allocating costs between jobs in Montgomery and Brazoria counties. The State did not file any Motion for Sanctions for failure to produce. The underlying documents had been subject to previous review by state auditors in Buckner's office. The invoices and checks were produced at trial in boxes and were admitted into evidence without objection.

It is well established that to prove up a summary of business records, a party must establish that the records are voluminous, the records have been made available for inspection or are present in the courtroom, and the business records themselves are admissible into evidence. *Duncan Development v. Haney*, 634 S.W.2d 811, 812–13 (Tex.1982); *Hovas*, 654 S.W.2d at 803. Appellee met its burden of proof for admission of the summaries. These ledgers and payroll record were not themselves summaries but were the business records and were admitted into evidence without objection. It is readily verifiable that these were voluminous records; Exhibit 89 was prepared for this reason. The State's complaint, then, concerns the availability and completeness of the invoices and checks underlying Exhibits 75 through 85. TEX. R.EVID. 1006 does not even require that such underlying documents be made available for examination as it does for the original writings. *See* 1A R. Ray, *Texas*

*Law of Evidence Civil and Criminal* § 1253. (Texas Practice 3rd ed. 1980). Thus, the summary, Exhibit 89, was also qualified for admission. We overrule the third and fourth points of error.

■ In the fifth and seventh points of error, Appellant claims the trial court erred in rendering judgment on the jury's answer to Special Issue No. 2 because the evidence of damages was insufficient and in failing to grant its motion for remittitur because the verdict was excessive. Appellants claim Appellee's evidence was incomplete and inaccurate and included items which could not have been foreseen by the parties to the contract at the time it was signed. It also alleges that the bulk of damages claimed was the result of collateral contracts which were specifically forbidden by the State in its contract. It alleges further that when A–1 left the job, it was overdrawn in the amount of only $3,983 and that any other money Buckner had given it was in the form of loans. It cites testimony that when Highway left the job, it was overdrawn in the amount of $127,694.17. Thus the difference between the overdrawn amounts and substantiated expenses minus payments it claims were made by the State at that time, Buckner's costs were $157,-430.16 and any award greater than that was so excessive as to shock the conscience and require remittitur. The substance of Appellant's argument is that Appellee illegally bid the job for subcontractors and had them do all the work on the job without the State's knowledge and consent and that Appellee could not accurately substantiate its allocation of expenses incurred and monies spent between the Montgomery County and Brazoria County jobs. It also maintains that the necessary "causal connection between the State's alleged breach of contract and the damages claimed by Buckner" was not proven.

An amount of damages need not be proven with mathematical precision. To prove such amount, the injured party must produce the best evidence available; if that evidence sufficiently provides a reasonable basis for determining his loss, his recovery

is not to be denied because he cannot ascertain the exact amount of damages. *Gulf Coast Investment Corp. v. Rothman,* 506 S.W.2d 856, 858 (Tex.1974), *citing Hindman v. Texas Lime Co.,* 157 Tex. 592, 305 S.W.2d 947, 953 (1957); *Vance v. My Apartment Steakhouse of San Antonio,* 677 S.W.2d 480, 484 (Tex.1984). The amount of damages should be fixed by the fact-finder in the exercise of sound discretion when the damages cannot be calculated with mathematical certainty. *Gill v. Guy Chipman Co.,* 681 S.W.2d 264, 270 (Tex.App.—San Antonio 1984, no writ). Further the Court of Appeals is not to disturb jury awards if there is any probative evidence to support the amount of damages. *See Northwest Mall v. Lubri-Lon International,* 681 S.W.2d 797, 804 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.), and *T.J. Allen Distributing Co. v. Leatherwood,* 648 S.W.2d 773, 775 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.).

As previously noted, when faced with a sufficiency challenge, the appellate court is to review all the evidence in the record to determine whether it is so weak or the evidence to the contrary so overwhelming that the finding should be set aside and a new trial ordered. *Garza,* 395 S.W.2d at 823. Several witnesses testified that it is common practice in Texas for larger contractors to bid jobs for smaller subcontractors who are not sufficiently financed to bid the job themselves. Buckner's officers testified they had frequently used subcontractors on their previous state jobs with the knowledge of the state and without any problems. Holzworth actually knew or had reason to know of Buckner's use of a subcontractor within a few months of the commencement of work, yet he did not shut down the job as he was empowered to do. The original bid computed by A–1 was based on its estimate that it would need to apply two primer coats and one finish coat to the bridges and would have to sandblast the old paint only to the extent required in the contract. Because of the poor paint and the requirement that they sandblast more than they anticipated, A–1 faced financial ruin and had to receive advances from Appellee. A–1 had lost $100,000 by the time it left the job, which amount is not part of this claim or the money lost by Buckner while A–1 was the subcontractor. After A–1 left the job, Buckner hired Highway at an increased price to induce it to take the job. Highway immediately encountered the same problems A–1 had faced, thereby necessitating advances from Buckner to keep it afloat. Eventually Buckner took over the job completely, maintaining Highway's employees on the job and paying them.

One of Buckner's owners testified that this job was the principal reason for the increase in its indebtedness from $305,000 to $1,498,000 over a six-year period. Buckner's ledgers and payroll records, along with most of the underlying receipts and invoices, were admitted into evidence. Additionally, state auditors had spent five weeks in Buckner's home office going over its books. Exhibit 89 is a summary of the revenues received and the expenses incurred by Buckner on the Montgomery County job. According to the records, it received $362,465 in payment from the State; its expenses were $1,336,073.76 and overhead was $202,996.89. Its expenses included those for the period beginning in November, 1979, when Buckner took over the job from Highway. Buckner was assessed $19,180 in liquidated damages by the State for the days it ran over the allotted 300 days to complete the job. One of the company's owners testified he believed they would have completed it well within the scheduled time "if they had been treated right about the painting and sandblasting." Its net loss was $1,176,605.65. The jury awarded Buckner $840,000 in damages. We find that the evidence recounted here, and it is only part of Buckner's evidence, is sufficient to prove a causal connection between the State's alleged breach of contract and the damages claimed by Buckner. Buckner's breakdown of its receipts and expenses was uncontroverted by any State witness, although the State did elicit testimony from the witness on cross-examination that he did not document every expense and relied

frequently on his best judgment to allocate expenses between the jobs in the two counties. Further, several of the lesser charges were revealed to be incorrect. It is to be remembered, however, that the verdict was for substantially less than the damages claimed by Buckner.

■ The State also claims that Buckner is not entitled to recover overhead expenses of $202,996.89 for the job, as it offered no proof that these costs were proximately caused by construction delays. It is the rule in Texas that a party must request that the damages issue be subdivided into categories before a party preserves its right to contest the sufficiency of the evidence for only one category. The State neither requested that the issue be submitted in this manner nor objected to the form in which it was submitted. That form required the jury to "determine the amount of money, if any, that would compensate plaintiff for all the damages it suffered as a result of defendant's conduct as referred to in Special Issue No. 1."

■ The State claims as well that the damages were uncollectible because they were unforeseeable, as Buckner did not adhere to the terms of the contract which required it to perform at least 50% of the work itself and to obtain prior permission from the commission or the engineer before subcontracting any part of the work. Thus, it argues, Buckner was left at the mercy of the subcontractors when they claimed they could not proceed with the work. The record reveals, however, that the engineer knew of Buckner's use of subcontractors by the end of May, 1978, approximately three months after the work commenced. He also testified that he didn't know what the contractor's arrangements were and depended on him to fulfill the contracts; the engineer's office was to see that the work was done according to the contract specifications. Several witnesses testified that the practice of using unofficial subcontractors was common in the state and had not previously caused any problems.

The State argues further that Buckner's right to recover for a loss stemming from collateral contracts is foreclosed. For losses resulting from a collateral contract, an injured party may recover from a defaulting party for the amount of damages he was required to pay to a third party for his breach of their contract if the injured party can establish that at the time of the original contract the defaulting party had knowledge of the special circumstances which produced the damages. In other words, the formation of a collateral contract must have been foreseeable. *Longview Construction and Development v. Loggins Construction*, 523 S.W.2d 771, 777 (Tex.Civ.App.—Tyler 1975, writ dism'd by agr.); *Iowa Manufacturing v. Baldwin*, 82 S.W.2d 994, 997–998 (Tex.Civ.App.—Eastland 1935, writ dism'd). Here, Buckner sued for its own damages due to the losses it sustained, and not for damages it was forced to pay its subcontractors. It is also true that the State did not object to the Special Issue concerning damages on the ground that the jury should have been instructed to find only those damages which were foreseeable, nor did it request the submission of an issue in those terms. Hence, it has waived this complaint. We overrule the fifth and seventh points of error.

■ In the sixth point of error, Appellant argues the trial court erred in admitting, over proper objection, the hearsay testimony of Marvin Lewis, as the testimony did not fall within an exception to the hearsay rule and was prejudicial to its case. The statement by Lewis occurred during a conversation between Buckner's accountant, Crockett, and a State auditor, Lewis, who had been sent by the State to review Buckner's records following the filing of this suit. Crockett asked Lewis why Buckner didn't "get a better 'shake' down there at the Claims Department." Crockett claimed Lewis replied that Buckner had attacked the reputations of some of the State's employees and that, as a bureaucracy, they didn't want to see one of their people attacked or made to look bad. As bureaucrats, they stuck together and would do everything they could to defend each other. The State did not call Lewis as

a witness to deny making the statement or otherwise explain it.

An admission by a party-opponent is offered against a party and is a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship. It is an exception to the hearsay rule. TEX.R.EVID. 801(e)(2)(D); *Elliot Valve Repair v. B.J. Valve & Fitting*, 675 S.W.2d 555, 562 (Tex.App.—Houston [1st Dist.]), *rev'd on other grounds*, 679 S.W.2d 1 (Tex.1984) (per curiam). The fact of agency must be established before a declaration can be admitted. *Texas General Indemnity v. Scott*, 152 Tex. 1, 253 S.W.2d 651, 655–56 (1952). Clearly Lewis was acting as an agent of the State at the time he was auditing Buckner's books. Moreover, even though Crockett phrased his question in terms of "just talking," he obviously wanted information concerning the attitude of the State toward Buckner's claims against it and why they had not been paid or why the Claims Committee turned down others. The State's purpose in being there was to audit the books subsequent to the filing of the lawsuit. TEX. R.EVID. 801(e)(2) places no restrictions on opinions that are admissions by party opponents. Nor is it required under Rule 801(e)(2)(D) that the statements be authorized by the principal, as long as the statement is made during the existence of the employment relationship and concerns a matter within the scope of the employment. Wellborn, *Article VIII: Hearsay, Texas Rules of Evidence Handbook*, 20 Hous.L. Rev. 477, 502 (1983).

Even if the trial court had abused its discretion in admitting the statement, the standard of review for such an error renders it harmless. That standard requires that the trial court has abused its discretion and that an examination of the entire record shows that the erroneous ruling must have amounted to such a denial of Appellant's rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. TEX. R.CIV.P. 434; *Cloud v. Zellers*, 158 Tex. 253, 309 S.W.2d 806, 808 (1958); *De Leon v. Otis Elevator Co.*, 610 S.W.2d 179, 182 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.). As we noted earlier, the entire record reveals evidence sufficient to support the jury's findings that the actions of the State were arbitrary and capricious. The statement by itself was not sufficient to have caused the rendition of an improper verdict. We overrule the sixth point of error.

■ Appellant argues in the eighth point of error that the trial court erred in submitting the issue on damages because it did not allocate the damages to the actual conduct for which there is an affirmative finding. Special Issue No. 1 stated: "Do you find from a preponderance of the evidence that any decisions made by the resident engineer with regard to the contract in question were arbitrary and capricious, or were based upon partiality, fraud, misconduct, or gross error? You are instructed that in answering this issue you can consider only the following decisions: (1) Whether or not he required Buckner Construction Company to use paint which was not suitable for the job, and/or, (2) Whether or not he required Buckner Construction Company to clean the bridges more than the requirements contained in the plans and specifications, and/or, (3) Whether or not he furnished an inspector or inspectors who were not suitable for the job." The State objected at trial to the submission of the issue, citing as an example that if the jury affirmatively found that the engineer did not supply suitable paint, the issue should confine damages to the expenses or damages incurred because of such paint. Special Issue No. 2 asked, "What sum of money, if any, now paid in cash, would compensate plaintiff for all damages suffered as a result of defendant's conduct to Special Issue No. 1?" Thus it was predicated on an affirmative answer to the first special issue. The trial court submitted an instruction that the amount of damages is "the difference between the contract price and the reasonable and necessary expenses incurred ... as a result of defendant's conduct referred to in Special Issue No. 1." An appellate court is to presume that the jury followed the court's instructions.

*Turner, Collie & Braden v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex.1982). We assume, then, that the jury found only those damages which resulted from the improper conduct it found in its answer to Special Issue No. 1.

Appellee admits in its brief that this point of error is predicated on this court's finding that there was no evidence or insufficient evidence to support the jury's findings in Special Issue No. 1. We refer to our discussion of points one and two that the evidence was sufficient to sustain the findings. Further, the wording of both the Special Issue and the instruction were such that the jury could have answered the damages issue only if it found improper conduct in answer to the first special issue. The trial court has discretion to submit issues broadly and it is not objectionable that a question includes a combination of elements or issues. TEX.R.CIV.P. 277. We do not find a variance between the pleadings and proof before us or any other defect that would justify a different issue. No error is committed without a substantial, misleading and prejudicial variation between the pleadings and the proof. *Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 937–38 (Tex.1980).

Appellant cites *Hindman v. Texas Lime Co.*, 157 Tex. 592, 305 S.W.2d 947 (1957) in support of this point. The *Hindman* court held that when a plaintiff has produced the best evidence available, and that evidence provides a reasonable basis for estimating his loss, he cannot be denied a substantial recovery because the exact amount of damage is not ascertainable. *Id.*, 305 S.W.2d at 953, quoting *Shannon v. Shaffer Oil Co.*, 51 F.2d 878, 881 (10th Cir.1931). The only case Appellant cites is *Hindman*, and it makes no other argument in support of the stated error. It does not cite any cases which discuss the proper form of special issues. Because Appellant inadequately briefed this point of error, it is waived. *Bellefonte Underwriters Insurance v. Brown*, 663 S.W.2d 562, 575–576, 579, 580, 584 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.); *Nolan v. Bettis*, 577 S.W.2d 551, 556 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.); TEX.R.CIV.P.

418(e). We overrule the eighth point of error.

■ In its ninth point, Appellant claims trial court error in its failure to admit Appellant's Exhibit No. 27, the file kept by the state engineer, Holzwarth, for the Montgomery County project. Again, the State has failed to adequately brief this point, thereby waiving it. It cites only TEX.R.EVID. 803(8) in support of its claim. Further, Appellant admits that it offered the file with the proviso that a predicate would be laid for its subsequent admission under TEX.R.EVID. 803(8). It does not point out in the record where it laid the predicate and had the file accepted, but argues only that it again offered the file into evidence. The cited pages reveal that a memo written by Holzwarth, which was part of the file, was admitted into evidence. Appellee based its objection to the admission of the *entire file* on the grounds that it contained inadmissible matters. It became the State's burden to separate the inadmissible parts from the admissible, and offer just those admissible parts. TEX.R. EVID. 105(b); *J.V. Harrison Truck Lines v. Larson*, 663 S.W.2d 37, 42 (Tex.App.— Houston [14th Dist.] 1983, writ ref'd n.r.e.). The State failed to sustain this burden. We overrule the ninth point of error.

■ In the tenth point of error, Appellant complains the trial court erred in excluding several depositions, as they were not hearsay and were admissible to show practice, habit and reputation and to impeach one of Appellee's witnesses. Appellant refers to eleven out-of-state depositions from engineers and inspectors which it wanted to offer in their entirety to show the habit, routine, and practice of James Dados of Bonded Painting and Gust Kafas of Highway Painting. Dados was President of Bonded, a company affiliated with Highway, whose president was Kafas. The State sought to impeach Dados as an expert and to show that Dados and Kafas and their respective companies were involved in a continuing scheme and design. The trial court overruled the tender on the basis of habit, routine, and practice. It

appears that the trial court also overruled the tender on the basis of a continuing scheme and design. At the time of its ruling on those grounds, the trial court stated it was not at that time making a ruling on the impeachment tender. Later it stated it would make that ruling on the depositions after reading them. The State responded that it would rest "in view of the fact that you have not read the depositions." The State did not file a formal bill of exceptions with the trial court and has not requested that the depositions be forwarded to the Court of Appeals.

Excluded evidence may be preserved for appeal if its proponent makes a record of his grounds for admissibility and obtains a ruling by the trial court, both of which must appear in the record, or if he files a formal bill of exceptions with the trial court. TEX.R.CIV.P. 372, 373. With either action, the record must reflect the request and the trial court's refusal to admit the evidence. *Industrial Disposal Supply v. Perryman Brothers Trash Service*, 664 S.W.2d 756, 762 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Harris v. Harris*, 605 S.W.2d 684, 687 (Tex.Civ.App. —Houston [1st Dist.] 1980, writ ref'd n.r. e.).

 A tender of evidence must reveal the answer its proponent expected to be given in the testimony if the trial court had not excluded it. *Gulf Paving v. Lofstedt*, 144 Tex. 17, 188 S.W.2d 155, 159 (1945). Even if excluded evidence were on file with the trial court and were sent to the appellate court, this would not be sufficient to preserve the error. *McInnes v. Yamaha Motor Corp., U.S.A.*, 673 S.W.2d 185, 187 (Tex.1984), *cert. denied,* — U.S. —, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). It was Appellant's burden to bring forward the record showing that the depositions were a part of it. *Escontrias v. Apodaca*, 629 S.W.2d 697, 699 (Tex.1982). Here the State did not complete the tender of the depositions to the trial court, but elected to rest its case instead. It did not read portions of the depositions into the record or offer any specific pages or lines into evidence. The State's initial offering was only one for the *complete* depositions. A complete deposi-

tion may not be taken to the jury room. TEX.R.CIV.P. 281. And, as previously noted, the proponent of evidence must separate the admissible parts of the evidence from those that are not. *J.V. Harrison Truck Lines*, 663 S.W.2d at 42. Buckner objected to portions of the depositions as inadmissible and the State failed to make a limited offer of admissible parts.

 Not only did the State fail to perfect its tender, but the evidence itself was inadmissible on other grounds. The State sought to use the testimony to show the habit, practice and routine of both Highway and Bonded Painting to impeach the testimonies of their officers. The testimonies concerned contracts entered into by these companies in other states. However, it is well-settled in Texas that transactions of a party to a lawsuit with persons who are not parties to the same lawsuit are inadmissible, as they are irrelevant, immaterial and highly prejudicial. The doctrine of "res inter alios acted" says that each act or transaction sued on must be established by its own particular facts and circumstances. *Texas Farm Bureau Mutual Insurance Co. v. Baker*, 596 S.W.2d 639, 642 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r. e.); *Payne v. Hartford Fire Insurance*, 409 S.W.2d 591, 594 (Tex.Civ.App.—Beaumont 1966, writ ref'd n.r.e.). For this added reason, we find the trial court did not abuse its discretion in refusing the admission of the evidence. Accordingly, we overrule the tenth point of error.

Appellant has filed a Supplemental Brief in which it presents five additional points of error along with its response to Appellee's motion for Penalty for Frivolous Appeal. The additional five points are not before us, as we granted leave only for Appellant's response to Appellee's motion and specifically denied leave to change or add any points of error.

 Appellee has filed with this court a Motion for Penalty for Frivolous Appeal seeking to have us require the State to pay a penalty of ten percent of the damages under TEX.R.CIV.P. 438. Appellee argues that the State has obviously filed the ap-

peal to delay execution of the judgment against it. It points out the errors in Appellant's brief and its inconsistencies with the record. We agree with Appellee that the State's brief contains numerous inconsistencies. However, to assess such a penalty, this Court must find that the appeal was taken for delay and that no sufficient cause existed for taking it. TEX.R.CIV.P. 438; *Texas Employers Insurance Association v. Campos,* 666 S.W.2d 286, 291 (Tex. App.—Houston [14th Dist.] 1984, no writ); *Landscape Design & Construction v. Warren,* 598 S.W.2d 38, 40 (Tex.Civ.App.— Texarkana 1980, writ ref'd n.r.e.). We find that sufficient cause existed for the State's appeal and that it was not taken solely for the purpose of delay. We deny Appellee's motion.

We affirm the judgment of the trial court.