Opinion issued January 15, 2004
  
 
 
 









     




In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00690-CV




CAROUSEL’S CREAMERY, L.L.C., Appellant

V.

MARBLE SLAB CREAMERY, INC., Appellee




On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2000-22503




O P I N I O N 

          Appellant, Carousel’s Creamery, L.L.C. (Carousel) appeals a judgment in favor
of Appellee, Marble Slab Creamery, Inc. (Marble Slab). We affirm in part and
reverse and remand in part.Background
          In the mid-nineties, intending to increase the size of its franchise system,
Marble Slab distributed to potential franchisees a Uniform Franchise Operating
Circular (UFOC), which contained representations of its two company-owned stores:
one on Westheimer Road and one on Montrose Boulevard. In 1997, Carousel began
investing in Marble Slab franchises, and, over time, operated several Marble Slab
franchise stores, until financial losses forced them to close.
          Carousel contends that the UFOCs it obtained from Marble Slab
misrepresented the value of the franchise, upon which it relied to its detriment. For
example, it contends that because the Westheimer store was far more lucrative than
the Montrose store, Marble Slab decided to sell the Montrose store in order to
“dramatically improve the financial results that could be portrayed in the UFOC with
the Westheimer store being used as the model store for marketing franchises.” After
the Montrose store was sold, Marble Slab’s UFOC reflected the financial performance
of only the Westheimer store, whose profits were atypical. Carousel also contends
that the UFOC mischaracterized the Westheimer store’s earnings because it did not
disclose that (1) the Westheimer store did not have labor costs, as corporate
employees and franchisee-trainees operated the store, and (2) the Westheimer store
catered corporate events, which generated more profits than in-store sales, and that
the catering events were also free of labor costs, as they, too, were performed by
corporate employees.


 According to Carousel, the Westheimer store’s financial data
showing an approximate net income return of thirty percent artificially inflated
profits.



          Carousel sued Marble Slab, asserting causes of action for violations of the
DTPA, negligent misrepresentation, and fraud,


 and Marble Slab counterclaimed for
breach of contract. The case was tried to a jury. The trial court granted Marble
Slab’s motion for directed verdict with respect to the negligent misrepresentation
claim, but denied the motion on the fraud and DTPA claims. The jury found against
Carousel on its fraud and DTPA claims. It also found that Carousel breached its
contract with Marble Slab and awarded damages to Marble Slab in the amount of
$55,810.18.
          In eight points of error, Carousel contends that the trial court erred as follows:
by granting Marble Slab’s motion for directed verdict on its negligent
misrepresentation claim (point 1); by excluding certain evidence (points 2-4); by
failing to include accountants and attorneys in the definition of Marble Slab’s agents
in the jury charge (point 8); and that the jury’s answers to questions one (fraud), three
(DTPA), and seven (Carousel’s breach of contract was not excused) were so against
the great weight and preponderance of the evidence that the verdict was clearly wrong
and unjust (points 5-7).
          Marble Slab brings three conditional cross-points, which it asserts in the event
that we sustain Carousel’s points two, three, four, five, six, or eight. Because we
overrule Carousel’s points two, three, four, five, six, and eight, we do not address
Marble Slab’s cross-points.
I.       Negligent Misrepresentation
          In its first point of error, Carousel contends that the trial court erred when it
sustained Marble Slab’s motion for directed verdict on the negligent
misrepresentation claim. In response, Marble Slab contends that the court’s ruling
was correct, because Carousel failed to establish it suffered an injury independent of
the contract and/or because the parole evidence rule, the merger/integration doctrine,
and the disclaimer clause in the franchise agreement bar Carousel’s negligent
misrepresentation claim.
A.      Standard of Review
          We follow the usual standard of review in examining the propriety of a directed
verdict. Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77
(Tex. 2000). 
1.       Evidence Supporting Carousel’s Claim
          The elements of a cause of action for negligent misrepresentation are as
follows: (1) a representation is made by the defendant in the course of his business,
or in a transaction in which the defendant has a pecuniary interest; (2) the defendant
supplies “false information” for the guidance of others in their business; (3) the
defendant did not exercise reasonable care or competence in obtaining or
communicating the information; and (4) the plaintiff suffers pecuniary loss by
justifiably relying on the defendant’s misrepresentation. Federal Land Bank Ass’n
of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991).
          The record contains some evidence that Marble Slab made a false
representation in the course of its business, or in a transaction in which it had a
pecuniary interest. Prior to 1996, Marble Slab did not provide prospective investors
with financial information on any company-owned stores. This practice changed,
however, in 1996 when, for the first time, Marble Slab’s UFOC included a “positive
earnings claim” which consisted of financial representations to prospective investors
regarding its company-owned store. Carousel’s investors reviewed Marble Slab’s
UFOCs, which described the Westheimer store. Dan Collins, one of Carousel’s
investors, testified that the UFOC he reviewed was misleading and inaccurate because
it failed to disclose that catering revenue was part of the total food sales of the
Westheimer store, understated labor costs, understated freight charges, and did not
identify franchisees that left the Marble Slab system. Carousel also presented
evidence that Marble Slab failed to exercise reasonable care or competence in
obtaining or communicating the information detailed in the UFOC. Marble Slab
admitted that it did not generate contemporaneous documents in the form of time
cards or other documentation when corporate employees provided labor at the
Westheimer store, and that, although the Westheimer store paid employees who
provided labor at that store, Marble Slab did not specifically disclose that corporate
employees periodically provided labor and services at the Westheimer store. 
Although Marble Slab was in possession of data that would allow it to calculate the
percentage of transfers or the percentage of franchisees that leave the Marble Slab
system, it did not calculate the overall turnover rate for the entire system. Collins
testified that Carousel purchased a Marble Slab franchise in 1999, and that Marble
Slab provided Carousel with its 1997 UFOC, whereas it should have provided him
with the 1998 UFOC. The 1998 UFOC differed from the 1997 UFOC in that the
turnover rate reflected in the 1998 UFOC was over twice the turnover rate reflected
in the 1997 UFOC. 
          There is evidence that Carousel justifiably relied on Marble Slab’s
representations. Collins testified that the cover page of the UFOC indicated that the
Federal Trade Commission had set rules and regulations requiring that the
information contained in the UFOC be truthful, accurate, and concise, and therefore
expected that the UFOC would in fact be accurate and not presented in a misleading
fashion. Item 19 of Marble Slab’s UFOC states:
Except for the information included in this offering circular, you
acknowledge that you have not relied in any manner on any warranties,
representations and/or guarantees regarding the profitability or other
results of operation of a particular franchise or on any proposed
franchise, and no such warranty, representation or guarantee has been or
will be made by Marble Slab.

Furthermore, Marble Slab’s Ronald J. Hankamer, Sr. testified that, if information is
included in Marble Slab’s UFOC, a prospective franchisee may rely on it. 
          The record also contains evidence that Carousel suffered pecuniary losses by
relying on Marble Slab’s UFOCs. Marble Slab circulated a memo to all of its existing
franchisees regarding freight charges and minimum order charges for franchises
located outside of the delivery area of its distributor. The freight bills for these
franchises amounted to approximately ten to twenty percent of their purchase price. 
This information was never provided to Carousel. Collins testified that this
information would have influenced Carousel’s decision to invest in Marble Slab,
because it directly affected Carousel’s bottom line. He opined that if Marble Slab’s
UFOC had contained a full disclosure, Carousel would not have purchased Marble
Slab franchises.
          Collins also testified that Carousel paid $225,000 for its location in Lafayette,
Louisiana. At the time of the purchase, he testified that the value Carousel actually
received was $20,000 if only the assets were to be considered in arriving at the
location’s value, and between $100,000 and $125,000 if the location were to remain
within the Marble Slab system. When Carousel sold the Lafayette store, it received
$112,500. When Carousel purchased the Lafayette location, it believed that it was
purchasing a “viable business plan for an ice-cream store.” Collins testified that what
Carousel actually received, however, was “a business that needed a high volume of
corporate catering, free labor, and the luxury of not having to pay freight charges,”
and, without this subsidization, the business could not be profitable. Carousel’s total
operating losses from the years 1998 to the date of trial amounted to $308,189. 
Collins testified that if Carousel had never joined the Marble Slab system, it would
not have suffered the operating losses detailed above.
a.       Independent Injury
          Relying on D.S.A., Inc. v. Hillsboro Indep. Sch. Dist., 973 S.W.2d 662, 664
(Tex. 1998), Marble Slab contends that the directed verdict was proper because
Carousel did not show that it suffered an injury independent of the franchise
agreement. In D.S.A., the supreme court held that, in order to proceed on a claim for
negligent misrepresentation, the party must establish that it sustained an injury
independent of its contract claim. Id. at 663. 
          We note that Carousel abandoned its claim for breach of contract against
Marble Slab. Carousel does not complain that Marble Slab breached the franchise
agreement, but rather that Marble Slab misrepresented what it was selling to
Carousel. Therefore, Carousel has no obligation to show an injury independent of a
hypothetical contract claim, since for the purposes of this discussion, it has only one
claim: negligent misrepresentation. Texas jurisprudence has long recognized the co-existence of obligations and duties separately imposed by contract and tort. MCN
Energy Enterprises, Inc. v. Omargo De Colombia, 98 S.W.3d 766, 772 (Tex.
App.—Fort Worth 2003, pet. denied); see also Jim Walter Homes, Inc. v. Reed, 711
S.W.2d 617, 618 (Tex. 1986). These cases were not altered by D.S.A.: that court
expressly stated that it was not deciding whether a party breached a legal duty
independent of its duties imposed by contract. D.S.A., 973 S.W.2d at 663. 
          In fact, we believe that the concept of independent injury is not really the issue
in this case. The more logical analysis is whether Carousel has brought a claim
sounding in tort when the duty breached arises out of a contract. Generally, a party
may not assert a claim based upon tort when the only duty at issue arises from a
contract. Robles v. Consolidated Graphics, Inc., 965 S.W.2d 552, 559-60 (Tex.
App.—Houston [14th Dist.] 1997, pet. denied). We hold that Marble Slab had a tort
duty not to make negligent misrepresentations to Carousel, and that Carousel has
urged a legitimate tort — negligent misrepresentation — and not a breach of contract
claim disguised as a tort.
b.       The Disclaimer Clause
          Relying primarily on Schlumberger Tech. Corp. v. Swanson, Marble Slab
contends that the franchise agreement’s disclaimer clause provides an alternative
basis for overruling Carousel’s first point of error. We disagree. The disclaimer
clause Marble Slab relies upon provides as follows:
7.1FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT
RECEIVED FROM THE COMPANY (OR ANYONE ACTING OR
PURPORTING TO ACT ON BEHALF OF THE COMPANY) ANY
ORAL OR WRITTEN INFORMATION CONCERNING THE
POTENTIAL SALES, COSTS, INCOME OR PROFITS THAT MAY
BE DERIVED OR POTENTIALLY DERIVED FROM
FRANCHISEE’S STORE. FRANCHISEE ACKNOWLEDGES AND
AGREES THAT THE ACTUAL RESULTS OF FRANCHISEE’S
STORE MAY VARY FROM OTHER MARBLE SLAB CREAMERY
LOCATIONS. THE COMPANY EXPRESSLY DISCLAIMS ANY
WARRANTY, REPRESENTATION OR GUARANTEE REGARDING
THE ECONOMIC SUCCESS, IF ANY, OF FRANCHISEE’S STORE. 
FRANCHISEE FURTHER ACKNOWLEDGES AND AGREES THAT
ANY SUCH FRANCHISE AND THE ECONOMIC RESULTS
THEREOF ARE ENTIRELY SPECULATIVE IN NATURE. 
FRANCHISEE ACKNOWLEDGES THAT IT HAS NOT RELIED IN
ANY MANNER ON ANY WARRANTIES, REPRESENTATIONS
AND/OR GUARANTEES REGARDING THE PROFITABILITY OR
OTHER RESULTS OF OPERATION OF FRANCHISEE’S STORE,
NO SUCH WARRANTIES, REPRESENTATIONS OR
GUARANTEES HAVING BEEN MADE BY THE COMPANY OR
ANY ONE [sic] ON BEHALF OF THE COMPANY.

          In Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171 (Tex. 1997), the
supreme court held “that a release that clearly expresses the parties’ intent to waive
fraudulent inducement claims, or one that disclaims reliance on representations about
specific matters in dispute, can preclude a claim of fraudulent inducement.” Id. at
181. The court emphasized that a disclaimer of reliance or merger clause will not
always bar a fraudulent inducement claim, and concluded only that on the record
before the court in that particular instance, the disclaimer of reliance conclusively
negated as a matter of law the element of reliance. Id.
          In determining whether the disclaimer in this case is binding, Schlumberger
requires that we look at the contract and the circumstances surrounding its formation. 
Schlumberger, 959 S.W.2d at 179. In Schlumberger, the very purpose of the parties’
agreement was to resolve an existing dispute and to terminate their business
relationship. Id. at 180. The parties negotiated at arms-length and, during
negotiations, were represented by “highly competent and able legal counsel.” Id. 
Additionally, both parties were “knowledgeable and sophisticated business players.” 
Id.
          In this case, the parties did not enter into the agreement containing the
disclaimer to resolve an ongoing dispute. There was, in fact, no existing dispute at
the formation stage of the agreement. Unlike the Schlumberger agreement, which
contemplated the termination of a business relationship, the agreement entered into
in the instant case contemplated creating a business relationship. Considering that
no dispute existed between the parties during the formation of the agreement creating
the parties’ business relationship, when compared to Schlumberger, the disclaimer
clause in this case is not an important part of the basis of the bargain. Furthermore,
Carousel did not retain counsel to negotiate with Marble Slab, and Marble Slab has
not directed us to evidence in the record suggesting that the parties negotiated at
arms-length in arriving at the final terms of the agreement. Finally, considering that
the supreme court decided Schlumberger on its specific facts, we note that the level
of sophistication exhibited by Carousel does not rise to that of the Swansons in
Schlumberger.



i.        Representation Inconsistent with Contract Language
          Marble Slab relies on Fisher Controls Int'l, Inc. v. Gibbons, 911 S.W.2d 135
(Tex. App.—Houston [1st Dist.] 1995, writ denied), for the proposition that a
misrepresentation claim will fail when based upon purported misrepresentations
inconsistent with the specific language of a written contract. In Fischer Controls, this
Court stated that “[w]hen experienced executives represented by counsel voluntarily
sign a contract whose terms they know, they should not be allowed to claim fraud in
an earlier statement.” See id. at 141-42 (because the terms of the contract charged
plaintiff as a matter of law with the facts he contended were misrepresented, he was
unable to rely on any inconsistent oral representations preceding the written contract). 
          We distinguished Fischer Controls from Wagner v. Morris, 658 S.W.2d 230
(Tex. App.—Houston [1st Dist.] 1983, no writ). In Wagner, the plaintiffs were not
charged as a matter of law with knowledge of the facts which they contended were
misrepresented. Id., (citing Wagner, 658 S.W.2d at 234 (Evans, C.J., concurring)). 
We find this case to be analogous to Wagner. The contract does not charge Carousel,
as a matter of law, with knowledge of the true facts of the matter that it contends were
misrepresented. See Fischer Controls, 911 S.W.2d at 142. Carousel does not
complain about misrepresentations that contradict the terms of the contract, but
instead, of misrepresentations concerning the financial results of Marble Slab’s
company-owned store.
c.       The Merger / Integration Clause
          Marble Slab also contends that the merger/integration clause contained within
the franchise agreement is an alternative basis for overruling Carousel’s first point of
error. The merger/integration clause provides as follows:
8.4 This Agreement contains the entire agreement between the parties,
no representations, inducements, promises, or agreements, oral or
otherwise between the parties with reference thereto and not embodied
herein shall be of any force or effect.
          In Dallas Farm Machinery Co. v. Reaves, 307 S.W.2d 233 (1957), the supreme
court considered whether parol evidence was admissible, despite a merger clause in
a written contract, to establish that a contract was induced by fraud. The court held
that “a merger clause can be avoided based on fraud in the inducement and that the
parol evidence rule does not bar proof of such fraud.” See id. at 239. Likewise, in
an unpublished opinion, this Court has held that an integration clause in an agreement
did not preclude liability for a negligent misrepresentation claim because the
integration clause contemplated only contractual obligations, and not tort liability. 
See Desert Palm Properties, N.V. v. McFarlane, No. 92-00967-CV, (Tex.
App.—Houston [1st Dist.] June 14, 1996, writ denied) (not designated for
publication). Carousel presented evidence that Marble Slab misrepresented numerous
facts, including its labor and freight costs for its company-owned store, and those
misrepresentations induced Carousel to enter into its agreement with Marble Slab. 
We hold that Marble Slab has not defeated Carousel’s negligent misrepresentation
claim as a matter of law by its defensive issues. The trial court erred in directing a
verdict on Carousel’s negligent misrepresentation claim.
          We sustain Carousel’s first point of error.
II.      Point of Error Numbers Two and Three
          In its second point of error, Carousel contends that the trial court erred when
it excluded evidence in the form of deposition transcripts of other franchisees’
complaints to rebut Marble Slab’s argument that it has a “big happy franchise
family.”
A.      Waiver
          Carousel waived its second point of error because its contention on appeal that
Marble Slab opened the door to this testimony was never argued before the trial court. 
At trial, Carousel offered the evidence “for the purpose of presenting evidence on
reliance, intent, and materiality.” A party may not assert on appeal a basis for
admission of evidence not presented to the trial court. Arroyo Shrimp Farm, Inc. v.
Hung Shrimp Farm, Inc., 927 S.W.2d 146, 151 (Tex. App.—Corpus Christi 1996, no
writ). 
          We overrule Carousel’s second point of error.
III.    Intent, Materiality, and/or Reliance of Excluded Testimony
          In its third point of error, Carousel contends that the excluded testimony was
relevant to show the issues of intent, materiality, and reliance. Marble Slab contends
(1) that Carousel’s offer of proof failed to preserve error; (2) that Carousel waived
point three because it cited no authority in its appellate brief supporting its contention
that the excluded testimony was relevant to show the issues of intent, materiality, and
reliance; (3) that Carousel placed the matter in issue, thereby inviting error; (4)
relying on State v. Buckner Constr. Co., 704 S.W.2d 837, 848 (Tex. App.—Houston
[14th Dist.] 1985, writ ref’d n.r.e.), that res inter alios acta evidence is inadmissible,
because it is irrelevant, immaterial, and highly prejudicial; and (5) that Carousel
failed to establish that the error, if any, was harmful.
A.      Standard of Review
          We review the exclusion of evidence under an abuse of discretion standard. 
City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995). For the exclusion
of evidence to constitute reversible error, the complaining party must demonstrate
that (i) the trial court erred by excluding the proffered evidence, and (ii) the error
probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1). 
A successful challenge to the trial court’s evidentiary rulings usually requires that the
complaining party demonstrate that the judgment turned on the particular evidence
excluded. Alvarado, 897 S.W.2d at 753-54. In making that determination, we review
the entire record. Id. at 754.
          Carousel complains about the exclusion of the testimony of Gerald Calegan,
another Marble Slab franchisee, who would have testified that he also relied on the
representations in the UFOC, and used it to decide whether a Marble Slab franchise
would be a good investment. Calegan would not have invested had he known that the
UFOC was incomplete or that fifteen to eighteen percent of the company-owned
Marble Slab store’s revenue came from catering operations. Carousel contends that
this testimony was “not just relevant, but crucial, for Appellant to convince the jury
of MSC’s intent to defraud franchisees, the materiality of MSC’s lies, and the
justifiable reliance on the false statements.”
          The general rule, known as the doctrine of “res inter alios acta,” is that
transactions of a party to a lawsuit with persons not parties to the same suit are
inadmissible, because they are irrelevant, immaterial and highly prejudicial. State v.
Buckner Constr. Co., 704 S.W.2d 837, 841 (Tex. App.—Houston [14th Dist.] 1985,
writ ref’d n.r.e.). An exception to this rule permits the admission of prior acts or
transactions with other persons to show a party’s intent, where material, if those
individuals are so connected with the transaction at issue that they may all be parts
of a system, scheme, or plan. Underwriters Life Ins. Co. v. Cobb, 746 S.W.2d 810,
815 (Tex. App.—Corpus Christi 1988, no writ). 
          Carousel contends that the excluded evidence prevented it from presenting
corroborating evidence, and argues that the reason why the verdict turned on the
exclusion of this evidence was “because the only potential source of corroborating
evidence was from other franchisees who fell victim to Marble Slab’s scheme.” 
Carousel’s argument is essentially that the exclusion of and therefore absence of
corroborating evidence was calculated to cause, and probably did cause the rendition
of an improper verdict. Assuming that the trial court abused its discretion in
excluding this evidence, we must decide whether the error was harmful.
          The trial court, however, admitted other corroborating evidence which
supported Carousel’s contentions at trial. Collins testified that prior to filing suit
against Marble Slab, he received communications from other franchisees that “. . .
raised [his] suspicions that perhaps there may be a problem systemic to the entire
system.” One such communication was a letter authored by the president of the
Marble Slab Franchisee Association. The following exchange occurred regarding the
letter:
[Carousel’s Counsel]:      Now, during this period of time, you were receiving
communications from other parties or other franchisees that
raised a suspicion on your part that there may be a problem
with the basic business model of Marble Slab Creamery?
 
[Collins]:                         I received some information.

***
 
[Carousel’s Counsel]:      When was the first time you had ever heard of the Marble
Slab Franchisee association?
 
[Collins]:                         With a copy of this letter.
 
[Carousel’s Counsel]:      When you received the letter, was there any information in
the letter that raised your suspicions that perhaps there may
be a problem systemic to the entire system?
 
[Collins]:                         Yes, as a matter of fact, there was a sentence within the
document, in fact the whole document but one sentence
particularly that --
 
[Carousel’s Counsel]:      Please read the sentence that raised your suspicion about
the possibility of systemic problems in the system.
 
[Collins]:                         It says you may have thought you were the only one having
difficulty but you are not alone.
 
[Carousel’s Counsel]:      Now did you hear yesterday in opening statement that Mr.
Brown suggested that all of the franchisees were happy?
 
[Collins]:                         I did.
 
[Carousel’s Counsel]:      Is that consistent with what we see in this document that
was sent by Mr. Schulman?
 
[Collins]:                         No, it’s not.

Collins further testified that after Carousel filed suit against Marble Slab, he
investigated the letter’s assertions regarding the difficulties experienced by other
Marble Slab franchisees. Collins spoke with several dozen franchisees as part of his
investigation, and, following his investigation, Carousel amended its lawsuit against
Marble Slab. Collins further testified that Carousel received numerous documents
through discovery, which confirmed his suspicions.
          The trial court also admitted evidence Carousel offered regarding turnover
rates. Collins testified that he conducted an analysis, which revealed that the turnover
rates in the Marble Slab system almost doubled between 1997 and 2000. During the
rebuttal portion of its closing argument, Carousel’s counsel argued as follows
regarding Marble Slab franchise turnover rates:
Happy franchisees. I have heard that throughout. Again, oh, what a
tangled web we weave. If you look and you heard the evidence,
turnover rates of nearly 30 percent. 30 percent of the franchisees are
either transferring, terminating or leaving the system. 30 percent. That
is remarkable. Does that sound like a bunch of happy franchisees? 
Absolutely not.

          We hold that Carousel has not demonstrated that the exclusion of the proffered
evidence probably caused the rendition of an improper judgment. Considering all the
evidence admitted and excluded, the jury was presented with and was able to consider
the entire sequence of events, including evidence that Carousel was not the only
franchisee experiencing difficulties. Carousel made the jury aware that it received
communications from numerous franchisees substantiating its suspicion “that perhaps
there may be a problem systemic to the entire system,” and Collins read excerpts from
one such communication to the jury. Although Calegan’s deposition testimony would
have further corroborated Carousel’s argument and evidence, Carousel has not
demonstrated that the absence of Calegan’s testimony probably caused the rendition
of an improper judgment.
          We overrule Carousel’s third point of error.
IV.    Improper Argument
          In its fourth point of error, Carousel contends that the trial court erred in
allowing Marble Slab to comment on the fact that Carousel hired expert witnesses,
but did not call them to testify.
          The party complaining of improper jury argument has the burden to prove that
(1) the argument was improper, (2) the improper argument was not invited or
provoked, (3) error was preserved by the proper trial predicate, such as an objection,
a motion to instruct, or a motion for mistrial, (4) the improper argument was not
curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the
judge, and (5) the argument by its nature, degree and extent constituted reversible
error. Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 840 (Tex. 1979). We
conclude that Carousel invited Marble Slab’s comments.
          During Carousel’s closing argument, Carousel’s attorney stated:
[W]e did not bring you any experts. The people we brought to you were
the people who were involved with the transactions. The actual people. 
They were not professional witnesses, they were not paid to give
testimony. They are just honest, good folks. I also called the people
from their side because I knew that like I said in a court of law you can
pull the lawyers away and expose the truth and we did that. We did not
bring you any experts.
 
What did they do? They went and hired themselves an expert to -
- $250 an hour, Allen Westheimer to come in and trash Carousel’s
Creamery and they hired Michael Seid, $350 an hour to somehow
excuse what they did. None of them, none of them, none of them ever
looked at the accounting documents at Marble Slab, not one of them. If
they really wanted you to know the truth, wouldn’t they have spent some
of that money confirming what it is that they’re trying to tell you? There
is a reason they didn’t do that.

In reply, Marble Slab argued:
They got all the documents, they have every shred of paper
Marble Slab has generated in the last five years. And believe me, I
fought them every step of the way to give it to them because I didn’t
think it mattered. But they got every piece and they looked at it and they
hired people to look at it and they postulated about what was going to
happen and then they put on their case. . . .

***
 
And Burt Simon, their forensic accountant that they paid to go
through Carousel’s documents who, of course, didn’t testify in this case
told Allen Westheimer you can’t rely on any of this stuff because I did
a bunch of guessing trying to figure it out. He said I had to guess
because it [sic] just wasn’t anything there.

***
 
You heard testimony that Mr. Westheimer spent 60 thousand
dollars on this case and Mr. Seid spent 30. I would love for you to give
me 90. And add it to the number and make it 145,810.80. If you don’t
think they are worth that, if you don’t think that time is well spent, then
you are welcome to do whatever you think is right with those numbers. 
But don’t sit there and let him accuse me of hiring a gun to come here
and tell you something. Because you know what? They had every
opportunity to do it themselves. They actually looked to experts to
assist them with analyzing their data and you didn’t hear from them
either.

***
 
They had every piece of paper that we generated about catering,
about corporate labor, about everything. They have spent two years
fulltime [sic] creating this lawsuit. If there was an exert who would
raise his right hand and tell the truth and say they were reasonable in
relying on Schedule B, I submit to you that you would have seen them. 
He doesn’t exist. There is no amount of money that could get anybody
to sit in that chair and say it is reasonable to rely on Schedule B. To
[sic] the extent that they did at the exclusion of all other evidence. 

We hold that Carousel’s jury argument invited the comments made by Marble Slab,
and overrule Carousel’s fourth point of error.
V.      Factual Sufficiency
          In its fifth and sixth points of error, Carousel contends that the jury’s answers
to question numbers one (fraud) and three (DTPA) were so against the great weight
and preponderance of the evidence that they were clearly wrong and unjust.
A.      Standard of Review
          We review factual sufficiency of the evidence under the usual standard of
review. In re King’s Estate, 244 S.W.2d 660, 661 (1951).
1.       Fraud
          To prevail on its fraud claim, Carousel was required to prove all of the
following: (1) a material representation was made, (2) the representation was false,
(3) when the representation was made, the speaker knew it was false or made it
recklessly without any knowledge of the truth and as a positive assertion, (4) the
representation was made with the intention that it be acted upon by the other party, 
(5) the party acted in reliance upon the representation, and (6) the party suffered
injury. Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998). Carousel was
required to establish that its reliance was both actual and justifiable. Ernst & Young,
L.L.P. v. Pacific Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001).
2.       DTPA
          To prevail on its DTPA claim, Carousel was required to prove all of the
following: (1) Carousel was a consumer of Marble Slab’s goods or services; (2)
Carousel committed one of the false, misleading, or deceptive acts enumerated under
Section 17.46(b) of the DTPA, breached an express or implied warranty, or engaged
in an unconscionable action or course of action; and (3) these acts were the producing
cause of Carousel’s actual damages. Brown v. Bank of Galveston, Nat. Ass’n, 963
S,W,2d 511, 513 (Tex. 1998). Producing cause requires that the acts be both a cause-in-fact and a “substantial factor” in causing the injuries. Id. at 514. Stated
differently, it is an “efficient, exciting, or contributing cause, which in the natural
sequence of events, produces injuries or damages.” Id.
a.       Evidence of Causation
          Marble Slab argues that the jury findings are not against the great weight and
preponderance of the evidence because the evidence is factually insufficient to
support causation as to Carousel’s fraud and DTPA causes of action. Allen
Westheimer, a certified public accountant and certified fraud examiner, testified on
behalf of Marble Slab. Westheimer testified that he examined the circumstances
surrounding Carousel’s investment. He focused specifically on Carousel’s
investigation of the investment, and its management actions subsequent to its
purchase. He testified that the Carousel investors “made so many mistakes and errors
of business judgment and missed so many red flag warnings that came to their
attention that they only have themselves to blame for the troubles that they had.” He
arrived at this opinion after reviewing pleadings, income tax returns, accounting
documents, financial statements, profit and loss statements, depositions, minutes of
the meetings held by Carousel Creamery, several Marble Slab UFOCs, the due
diligence documents that the Carousel investors gathered in connection with their
purchase of their Marble Slab stores, correspondence, sales reports, paid out reports,
personal financial information, financial statements and tax returns of the five
Carousel investors, demographic information, and numerous other documents.
          Westheimer testified that the Carousel investors did almost no investigation at
all before purchasing the Seigen Lane store. The Carousel investors only reviewed
accounting records, paid bills, bank statements, and only the profit and loss statement
dated October 31, 1997, which covered only the first six and one-half months that the
store was open, before investing. They did not hire an attorney to assist them in
connection with the due diligence investigation, and it appeared to Westheimer that
the Carousel investors did not consult a CPA prior to investing. The Carousel
investors did not perform a market demand study, or feasibility study and had no
written plan for the proposed venture. Westheimer testified that the due diligence that
the Carousel investors performed was “negligent” and that “they seemed to have the
opinion that it was unnecessary to do that because they had been told that this store
had been badly managed and that all they really needed to do . . . was to come in and
provide good management . . . .” Westheimer testified that Carousel’s reliance on the
UFOC was unreasonable, and that the UFOC contains caveats that a reasonable
investor should heed when conducting due diligence. Wendy Little managed the
Seigen Lane store. Westheimer testified that she failed to adequately control the
staffing levels at Carousel’s creamery, and that she failed to track labor costs with
forms provided by Marble Slab. He also testified that her attempts or ability to
control the cash of the store were “pathetic” and that “red flags” were present
suggesting that she was stealing money.
          For example, the Seigen Lane store was paying for purchases directly from the
cash register, as opposed to depositing all cash receipts into a bank account. In
calender year 1999, the store paid out over sixty thousand dollars directly from the
cash register. The cash pay-outs continued, contrary to instructions to refrain from
this practice. In 2000, the store had $36,000 in cash pay-outs from the cash register. 
Ms. Little allowed payables to fall delinquent, and failed to report this to the other
Carousel investors. She began withdrawing money from other stores in order to pay
the bills.
          Westheimer also testified regarding Carousel’s Citiplace store. He described
the accounting practices prior to Carousel’s purchase of the Citiplace store as
“abominable.” When Carousel purchased the store, there was a large defiicit in the 
payroll tax account. Westheimer testified that his review of the Citiplace store’s
financial statements and documents raised an “enormous red flag” and that “anybody
receiving these financials with the idea of buying this business and seeing this
threadbare balance sheet and the negative payroll taxes would have been warned that
they needed to investigate this further to find out what’s going on.” 
          Westheimer testified that Carousel received a sales packet regarding the
Lafayette store that Carousel purchased, which included a profit and loss statement. 
Westheimer explained to the jury that profit and loss are measured over a period of
time, typically one year, and that the profit and loss statement from the Lafayette store
was not dated. There was no balance sheet included in the sales packet. Westheimer
testified that Carousel eventually obtained a balance sheet for the Lafayette store, but
that it, too, contained a “big red flag.” Specifically, the profit and loss statement
showed an $88,000 profit, but the area on the balance sheet detailing cumulative
profit and losses showed that the business had, from the date it opened, lost between
$38,000 and $39,000, and had not made $88,000. Westheimer testified that the
results of his investigation did not indicate that Carousel did anything to investigate
this discrepancy.
          In addition to testifying about individual stores in which Carousel had invested,
Westheimer also testified regarding Carousel’s general accounting and financial
procedures. Westheimer testified that Ms. Little was creating Quick Books reports,
but that she was creating them for each individual store, and did not create a
consolidated report for the entire Carousel organization. This prevented Carousel’s
investors from getting a picture of the entirety of the organizations profits or losses
except for once per year, and that Carousel’s investors should have been given up-to-date ongoing consolidated financial reports every month. When asked whether
Carousel stood a better chance of turning its business around had the accounting
problems been brought to the attention of the investors, Westheimer testified that
because these accounting practices were never brought to the attention of the
investors, the problems simply worsened. Westheimer testified that in his opinion,
there were no credible financial records, and that Carousel’s records were “totally
unreliable.” He added that Carousel’s records are not to be reasonably relied upon
to present fairly what their losses may have been, or to describe what their financial
position may have been in any point in time, and stated “you should not rely on any
of these in coming to any conclusions about what their damages might be.”
          Mr. Collins, one of the Carousel investors, acknowledged on cross-examination
that although he gave his fellow investors his “business judgment” that the Seigen
Lane store was a good investment, he did not review the store’s payroll tax and FTCA
information, the store’s bank statements, its freight costs, its insurance information,
its daily and weekly sales data, its workers compensation costs, and its financial
statements before investing. Furthermore, Collins did not speak with any Marble
Slab employees prior to advising his business partners that Seigen Lane was a good
investment, and did not contact other Marble Slab franchisees before investing. 
Collins testified that his business retained a attorney who was licensed in Texas, but
that the attorney did not review the franchise agreement. Collins, was asked at least
six times whether he read the franchise agreement for the Citiplace store before
signing and investing forty thousand dollars in it, but never gave a direct answer. The
trial court even instructed Collins that he was to answer the question, beginning with
either “yes” or “no” and informed him that he could then elaborate if elaboration was
required to make his answer true and correct, but Collins continued to evade
answering the question.
          Franchising expert Michael Seid, who reviewed pleadings, depositions, the
UFOC, and the Marble Slab franchise agreement testified that it was silly, foolish,
and improper for Carousel to rely on the UFOC detailing Marble Slab’s Westheimer
store. He testified that there is a historic correlation between the efforts put into the
investigation process and the ultimate degree of success one enjoys as a franchisee. 
Seid testified that he saw no evidence that the Carousel investors, as a whole,
conducted an independent investigation of the franchise offering. He testified that
three of the Carousel investors were “fairly sophisticated” individuals, who “should
have known better.” After reviewing the depositions given by the Carousel investors,
Seid stated:
. . . nowhere in the record I read . . . does anybody admit to reading the
UFOC. The best I can get to is somebody scanned it. The banker looks
at some papers that are disemboweled from the document, just ripped
out of a document and that’s what he’s making his evaluation on without
anything else about the document. They don’t do what we suggest about
calling the existing franchisees to find out if a franchisor is a miserable
person or if they are getting the services. They don’t engage an
accountant to review the box and records of the businesses they’re
buying. They don’t hire an attorney. They don’t prepare a business
plan. They don’t do anything.
 
They buy a franchise - - they buy a business. They don’t buy
franchisee [sic], they buy a business that sales ice cream without a clue. 
And you sit and you read the depositions as you did and you really feel
sad. Because they just didn’t do anything. And that’s what the
deposition said. So none of the things we recommend was [sic] done.

          Dan Collins testified as follows: His company invested almost one million
dollars in Marble Slab. Collins testified that Marble Slab failed to fully disclose in
the UFOCs the quantity and quality of catering performed by the Westheimer store,
that the Westheimer store’s labor costs were understated, and that Carousel would be
responsible for undisclosed freight charges. Collins testified that if Marble Slab had
fully disclosed this information, Carousel would have never purchased any Marble
Slab stores, and would not have bought rights to any Marble Slab stores. Carousel’s
total operating losses from the years 1998 to the date of trial amounted to $308,189. 
Collins testified that because Carousel would have never joined the Marble Slab
system, it would not have suffered any of the operating losses detailed above. He
testified that Carousel thought it was purchasing a “viable business plan for an ice
cream store” but actually received “a business that needed a high volume of corporate
catering, free labor, and the luxury of not having to pay freight charges . . . to make
it a profitable business.” Because Carousel could not duplicate the quality and
quantity of catering and did not have the luxury of free labor at its locations, Carousel
did not actually purchase Marble Slab stores that could make a profit in the locations
in which they were located. Because of this, Carousel essentially paid a premium
price for assets.
          We conclude that the evidence is not so weak nor is the finding so against the
great weight and preponderance of the evidence that it was clearly wrong and unjust. 
Specifically, we find that there is sufficient evidence to support the finding that
Marble Slab’s representations were neither a cause-in-fact nor a “substantial factor”
in causing Carousel’s injuries. Carousel is, therefore, unable to recover on its DTPA
and fraud claims. Carousel presented evidence inconsistent with the jury’s finding,
but the jury is the sole judge of the credibility of the witnesses and the weight to be
given to their testimony. Jones v. Tarrant Util. Co., 638 S.W.2d 862, 866 (Tex.
1982). The trier of fact may resolve conflicts and inconsistencies in the testimony of
any one witness as well as the conflicting testimony of different witnesses. Webb v.
Jorns, 488 S.W.2d 407, 411 (Tex. 1972). This Court cannot substitute its judgment
or its opinion for that of the jury. Lofton v. Tex. Brine Corp., 720 S.W.2d 804, 805
(Tex. 1986).
          We overrule Carousel’s fifth and sixth points of error.
VI.    Carousel’s Justification for Failure to Comply with the Franchise
Agreement
          In its seventh point of error, Carousel contends that the jury’s answer to
question number seven was (1) against the great weight and preponderance of the
evidence and (2) incorrect as a matter of law. Question 7 asked as follows:
          Was Carousel’s failure to comply excused?
Failure to comply by Carousel’s is excused if all of the following
circumstances occurred:
 
          1.       Marble Slab
 
                    a.       by words or conduct made a false representation or concealed
material facts,
 
                    b.       with knowledge of the facts or with knowledge or information
that would lead a reasonable person to discover the facts, and
 
                    c.       with the intention that Carousel’s would rely on the false
representation or concealment in acting or deciding not to act; and
 
          2.       Carousel’s
 
                    a.       did not know and had no means of knowing the real facts and
 
                    b.       relied to its detriment on the false representation or concealment
of material facts.

          Answer “Yes” or “No”

          Answer_________
The jury replied “No.” 
          Marble Slab contends that Carousel waived its great weight and preponderance
challenge to the answer to question seven by failing to assign it as a point in its
motion for new trial; it further argues that because Carousel did not file a motion for
judgment n.o.v. in the trial court, it failed to preserve the right to assert a “matter of
law challenge.” Indeed, Carousel failed to assign the jury’s answer to question seven
as a point in its motion for new trial, and failed to brief its complaint on appeal as a
matter of law challenge. Moreover, Carousel’s brief does not demonstrate that (1) no
evidence supports the jury’s determination that Carousel was justified in failing to
comply with the franchise agreement, or that (2) the evidence conclusively establishes
that Carousel was justified in failing to comply with the franchise agreement. See
Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).
          Carousel has, however, clarified its complaint in its reply brief. Its seventh
point of error does not concern the jury’s findings based upon the evidence presented
at trial, but, instead, complains that a finding in Carousel’s favor on its negligent
misrepresentation claim would have conclusively negated its liability to Marble Slab
on the contract. We liberally construe points of error in order to obtain a just, fair and
equitable adjudication of the rights of the litigants. Holley v. Watts, 629 S.W.2d 694,
696 (Tex. 1982). Accordingly, we interpret and analyze Carousel’s complaint as
urged in its reply brief.
          Carousel was entitled to have its negligent misrepresentation claim submitted
to the jury. If the jury had determined that Marble Slab negligently misrepresented
facts to Carousel, that misrepresentation would have allowed Carousel to avoid its
contractual obligations with Marble Slab. Russell v. Industrial Transp. Co., 258 S.W.
462, 462 (Tex. 1924); Citizens Standard Life Ins. Co. v. Muncy, 518 S.W.2d 391, 395
(Tex. Civ. App.—Amarillo 1974, no writ). 
          We sustain Carousel’s seventh point of error.
VII.   Refusal to Define Agents in the Charge
          In its eighth point of error, Carousel contends that the trial court erred in
refusing to include lawyers and accountants in the definition in its charge to the jury
defining Marble Slab’s agents. Marble Slab contends that Carousel failed to preserve
error because Carousel’s proposed instruction is not contained in the appellate record,
and because Carousel’s objection “. . . did not clearly designate the error and explain
the grounds for the complaint.” Castleberry v. Branscum, 721 S.W.2d 270, 276 (Tex.
1986).
          Rule 274 of the Texas Rules of Civil Procedure provides as follows:
A party objecting to a charge must point out distinctly the objectionable
matter and the grounds of the objection. Any complaint as to a question,
definition, or instruction, on account of any defect, omission, or fault in
pleading, is waived unless specifically included in the objections.
Tex. R. Civ. P. 274. An objection does not meet requirements of Rule 274 unless the
defect relied upon by the objecting party and the grounds of the objection are stated
specifically enough to support the conclusion that trial court was fully cognizant of
the ground of complaint and deliberately chose to overrule it. Chrysler Corp. v.
Roberson, 619 S.W.2d 451, 459 (Tex. Civ. App.—Waco 1981, no writ).          Carousel’s objection to the definition of Marble Slab was a follows:
[The Court]:                     . . . Any objections to the court’s charge from the plaintiff?
 
[Carousel’s Counsel]:      Yes, Your Honor. No. 1, plaintiff objects to the definition
of Marble Slab as it appears on page 3 because it does not
include attorneys and accountants which we believe is
appropriate to properly instruct the jury given the evidence
in this case and I am tendering to the court our requested
instruction No. 1 which includes those terms and would
ask the court to refuse or sign it as refused so we can file it.
 
[The Court]:                     Okay.

          We are able to distill three reasons from Carousel’s brief why it contends the
trial court should have defined agents to include accountants and attorneys: (1) “so
that the jury would clearly understand that MSC’s agents included its accountants and
attorneys.” (2) “MSC also made it clear to the jury that its law firm drafted the UFOC.
. . . As a result, the jury could have been confused and decided that if the law firm
was at fault, MSC was not liable.” (3) failing to define agents to include attorneys and
accountants “very likely misled the jury to conclude that MSC’s reliance on them was
an excuse for its tortious conduct.”
          Carousel waived any error because it failed to clearly designate the alleged
error and specifically explain the basis of its complaint in its objection to the charge. 
Tex. R. Civ. P. 274; Castleberry, 721 S.W.2d at 276. Carousel’s objection to the
definition of Marble Slab because it did not include attorneys and accountants,
“which [Carousel believed was] appropriate to properly instruct the jury given the
evidence in this case . . .” was not specific enough to support the conclusion that the
trial court was fully cognizant of the ground of Carousel’s complaint, and deliberately
chose to overrule it. Furthermore, the requested instruction is not included in the
appellate record, and we cannot consider matters outside of the appellate record. 
Exocet Inc. v. Cordes, 815 S.W.2d 350, 355-56 (Tex. App.—Austin 1991, no writ)
(construing former Rule of Appellate Procedure 50).
          We overrule Carousel’s eighth point of error.

Conclusion
          We reverse and remand the portions of the trial court’s judgment regarding
negligent misrepresentation and whether Carousel’s failure to comply with the
franchise agreement was excused for proceedings consistent with this Court’s
opinion. We affirm the judgment in all other respects.
 
 
                                                             Adele Hedges
                                                             Justice

Panel consists of Justices Nuchia, Higley, and Hedges.