Affirmed and Opinion filed November 9,
2010.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00528-CV



Reservoir
Systems, Inc. and Axel Sigmar,
Appellants 

v.

TGS-NOPEC
Geophysical Co., L.P., Appellee 



On Appeal from
the 280th District Court

Harris County, Texas

Trial Court
Cause No. 2007-04888



 

OPINION

            The
appellee, TGS-NOPEC Geophysical Co., L.P. (“TGS”) sued the appellants,
Reservoir Systems, Inc., and Reservoir’s president and owner, Axel Sigmar, for
breach of contract and fraud arising out of a failed business venture. 
Reservoir asserted counterclaims.  After a bench trial, the trial court found
in TGS’s favor and ordered that TGS recover $5 million on its
breach-of-contract claim against Reservoir and $735,000 on its fraud claim
against Sigmar.  On appeal, Sigmar challenges the legal and factual sufficiency
of the evidence supporting the fraud finding and contends that, because TGS’s
only injury was the economic loss of the contract, TGS’s claim sounds in
contract alone, not tort.  Reservoir does not challenge the breach-of-contract
finding against it, but does contend on appeal that the trial court erred by
excluding all evidence of damages on its counterclaims against TGS.  For the
reasons explained below, we affirm. 

I

            TGS
records and processes geophysical seismic data, primarily offshore, and sells
the data to oil and gas companies.  Sigmar, in addition to being the president
and owner of Reservoir, also was a shareholder Reservoir Systems International
S.A. de C.V. (“RSM”), a Mexican company.  Some years before 2006, Sigmar began
pursuing a series of potentially lucrative “direct award” contracts between RSM
and Pemex, Mexico’s national petroleum company.  The contracts were to provide
advanced seismic technologies to Pemex to allow it to gather survey information
for Pemex’s producing wells in Mexico.  TGS was intrigued by Sigmar’s ability
to obtain a direct-award contract with Pemex and was looking for an opportunity
to develop contacts that would enable it to conduct business in Mexico.  In April
2006, TGS began discussing a business arrangement with Sigmar.  

            Initially,
TGS considered acquiring an equity position in the project, but eventually
decided to loan Reservoir $5 million instead.  The loan, dated May 5, 2006, was
secured by a promissory note.  The loan’s purpose was to help Reservoir obtain
a $30-million loan from Alliance Capital to finance the Pemex project,
including obtaining a source vessel from which the seismic data would be
gathered.[1] 
TGS also located and arranged for a source vessel and provided consulting
services.  Sigmar had told TGS that he was very close to arranging the $30
million in financing from Alliance Capital.  Based on Sigmar’s representations,
TGS believed that its loan was needed for Sigmar to finally attain the additional
financing.  Ultimately, however, Sigmar failed to secure this financing.  

            The
project began to stall when vendors were not paid for their services.  In
September, before the start of operations, TGS notified Reservoir that it
intended to call the loan.  Reservoir did not repay the loan on the due date. 
TGS attempted to salvage the project through meetings with vendors, RSM’s
shareholders, and others who wanted Sigmar to relinquish operational and
financial control, but Sigmar would not agree.  The project remained
undercapitalized, and eventually TGS decided not to invest any more money in
it.  Pemex later sued RSM to rescind the contract.

            Kim
Abdallah, the vice president of business development at TGS, testified at trial
that TGS relied on Sigmar’s representations when it decided to invest in the
Pemex project.  Among other things, Sigmar represented that he had strong ties
with well-connected individuals in Pemex and the Mexican government.  According
to Sigmar, the brother of Mauricio Mireles, one of RSM’s shareholders, had
worked at the treasury department in customs and was going to provide important
guidance regarding importation problems.[2] 
The principal of another shareholder, Erwin Larranaga, was in law enforcement
and national security and was expected to provide protection for the
equipment.  TGS was interested in obtaining access to Sigmar’s contacts and
would not have participated in the Pemex project or loaned Reservoir $5 million
but for Sigmar’s contacts.  But by November 2006, the shareholders had filed a
lawsuit in Mexico disputing Sigmar’s authority as president of RSM.  

            Sigmar
also represented that he had strong relationships with an “alliance” of
companies that were purportedly already committed to perform the services required. 
The alliance supposedly included, among others, Paulsson Geophysical Services,
Inc. (“Paulsson”).  Paulsson owned a trademarked technology known as “Massive
3D VSP,” which Sigmar claimed to have permission to use.  This representation
was reflected in Sigmar’s PowerPoint presentation to TGS as well as in a
services agreement between RSM and Reservoir.  Additionally, the stated purpose
of the July 2006 Pemex contract was for RSM to “obtain and process data from
massive 3D seismic vertical profiles in the marine or inland areas, using
Massive 3D VSP technology, for the assets of [Pemex].”  TGS relied on Sigmar’s
representation that Paulsson was involved in the project when it decided to
invest.  Contrary to this representation, however, Sigmar was not authorized to
provide Paulsson’s technology.[3]

            The
loan agreement between TGS and Reservoir expressly provided that Reservoir was
not to use the loan proceeds for any purpose other than “securing and servicing
the Pemex contract.”  Abdallah testified that the purpose of the loan was to
“engage the operations going forward,” such as obtaining the source vessel and
paying for a performance bond.  When Reservoir received the loan, Sigmar
conveyed $2 million of it through Tao Technologies to RSM.[4]  Sigmar
testified that RSM then sent some of the $2 million back to Reservoir to pay
expenses incurred before the loan was made.  Sigmar also testified that some of
the outstanding invoices were from Sigma Research & Development, a company
Sigmar owned.  Sigma Research then paid some of the money received from
Reservoir to Sigmar for expenses predating the loan.  According to Sigmar,
these expenses included repayment of loans he had made to Sigma Research and
for his salary.  Sigmar also testified that some of the money was transferred
from Reservoir to Maribel Properties, another company he owned, to cover
Reservoir’s back rent.  Sigmar admitted that about $735,000 found its way into
an account apparently for his personal use.  

            Abdallah
testified that TGS would not have made the loan if it had known that Sigmar was
not going to use all of it to secure and service the Pemex contract; nor would
it have done so if it knew Sigmar was going to pay himself “over $900,000” of
the loan proceeds.  

II

            Sigmar
first contends the evidence is legally and factually insufficient to support
the trial court’s finding that he committed fraud.  To demonstrate fraud or
fraudulent inducement, TGS was required to show that (1) Sigmar made a material
misrepresentation to TGS, (2) the representation was false and Sigmar knew it
was false when it was made or he made it without knowledge of its truth, (3)
Sigmar made the representation with the intention that TGS act on it, (4) TGS
acted in reliance on it, and (5) the representation caused TGS injury.  Formosa
Plastics Corp., USA v. Presidio Eng’rs & Contractors, Inc., 960 S.W.2d
41, 47 (Tex. 1998).  Fraudulent inducement is a particular species of fraud
that arises only in the context of a contract and requires the existence of a
contract as part of its proof.  Haase v. Glazner, 62, S.W.3d 795, 798–99
(Tex. 2001).

A

            A
trial court’s findings are reviewable for legal and factual sufficiency of the
evidence by the same standards that are applied in reviewing evidence
supporting a jury’s answer.  Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994); CA Partners v. Spears, 274 S.W.3d 51, 69 (Tex. App.—Houston
[14th Dist.] 2008, pet. denied.).  If there is more than a scintilla of
evidence supporting a finding of fact, we will overrule a legal-sufficiency
challenge.  CA Partners, 274 S.W.3d at 69.  In reviewing a
factual-sufficiency challenge, we consider all of the evidence and will set
aside a finding only if it is so against the great weight and preponderance of
the evidence as to be clearly wrong and unjust.  Id.  

            When,
as here, the trial court files no findings of fact or conclusions of law, the
trial court’s judgment implies all findings of fact necessary to support it.  Pharo
v. Chambers County, 922 S.W.2d 945, 948 (Tex. 1996).  But when a reporter’s
record is filed, these implied findings are not conclusive and may be
challenged for legal and factual sufficiency.  See Roberson v. Robinson,
768 S.W.2d 280, 281 (Tex. 1989) (per curiam).

B

            Sigmar
contends there are two specific bases for the trial court’s fraud finding:  (1)
the allegation in TGS’s petition that Sigmar represented that the loan was to
be used for securing and servicing the Pemex contract; and (2) the trial
court’s determination that Sigmar fraudulently used some of the money to pay himself
back.[5] 
Sigmar then contends the evidence is legally and factually insufficient to
support either theory.  

            In
its live pleading, TGS alleged the following:

Sigmar made false representations
that TGS-NOPEC relied upon to its detriment before entering into the Loan
Agreement and Promissory Note.  Specifically, Sigmar misrepresented that he had
disclosed all material facts related to [Reservoir]’s financial condition,
business, properties, or prospects to TGS-NOPEC.  Further, Sigmar represented
that he would not use the proceeds of the Loan for any other purpose than
securing and servicing the Pemex contract. (as referenced in the Loan
Agreement).  Upon information and belief, [neither] Sigmar nor [Reservoir] used
the full proceeds of the Loan to secure and service the Pemex contract.  

First,
Sigmar contends the representation that the loan was to be used solely for
securing and servicing the Pemex contract was not a misrepresentation and was
not material to TGS.  Sigmar points to his testimony that, after receiving the
$5 million loan, Reservoir conveyed $2 million of it to RSM to pay outstanding
debt to several entities, including Reservoir.  Reservoir was then able to
begin paying its vendors (including some that were owned in part by Sigmar),
Sigmar’s salary, and a loan from Sigmar.  Sigmar testified that the $735,000
was used to repay him for loans he had made to Sigma Research and Reservoir and
for salary that Sigma Research owed him.  Sigmar also points to his testimony
that he had taken out loans against his 401(k) and his house to pay expenses he
incurred in securing and servicing the Pemex contracts.  Sigmar argues that his
testimony that all of the outstanding debt was incurred for the purpose of
securing and servicing the Pemex contract is uncontradicted.  

            Sigmar
also points to TGS’s admission that it knew its $5-million loan was for
“working capital in the start-up phase” and argues that there is nothing in the
record to indicate that the representation that the loan proceeds were to be
used solely to secure and service the Pemex contract was material to TGS. 
Sigmar argues the lack of materiality is demonstrated in Abdallah’s admission
that TGS decided to loan money to Reservoir because TGS did not care about
Reservoir’s work and “[i]t was really about buying into the relationships.”

            In
connection with his argument, Sigmar asserts that to the extent TGS is
complaining that he committed fraud by nondisclosure, the record is devoid of
any evidence that he had any duty to disclose information to TGS or that the
other elements of fraud by nondisclosure exist.[6] 
Fraud by omission or non-disclosure is simply a subcategory of fraud because
the omission or non-disclosure may be as misleading as a positive
misrepresentation of fact when a party has a duty to disclose.  Solutioneers
Consulting, Ltd. v. Gulf Greyhound Partners, 237 S.W.3d 379, 385 (Tex.
App.—Houston [14th Dist.] 2007, no pet.).  But TGS did not allege
a fraud-by-nondisclosure claim, the case was not tried on this theory, and the
appellants did not argue below that TGS could not prevail on its fraud claim
because Sigmar owed no duty to disclose information to TGS.  Further, the trial
court’s judgment awarded recovery to TGS based on TGS’s “claim of common[-]law
fraud.”  We conclude, therefore, that the legal and factual sufficiency of the
evidence is properly reviewed against the elements of a common-law fraud
claim.  

            Sigmar
relies heavily on his own testimony that he had incurred past debt in
connection with the project and was entitled to be paid back, that all of the
loan proceeds were used to secure and service the Pemex contract, and that in
any event using the money to pay back debts was not material to TGS.  But the
fact finder is the sole judge of the credibility of the witnesses and the
weight to be given their testimony.  Barrientos v. Nava, 94 S.W.3d 270,
288 (Tex. App.—Houston [14th Dist.] 2002, no pet).  The trial court could have
determined that Sigmar’s conduct in transferring some of the loan proceeds from
Reservoir to Tao Technologies, to RSM, back to Reservoir, and then to Sigma
Research, which in turn sent it to Marabel Properties and to Sigmar himself
evinced Sigmar’s intent to carry out a covert scheme to funnel TGS’s loan money
through his companies to himself rather than the innocent repayment of debt
legitimately incurred in connection with the Pemex project.  See Spoljaric
v. Percival Tours, Inc., 708 S.W.2d 432, 434–35 (Tex. 1986) (stating that
intent is a fact question uniquely within the realm of the trier of fact).

            Sigmar
contends it was clear that “everyone at TGS knew of [Reservoir’s] desperate
need of money” and therefore TGS knew the loan proceeds would be used to pay
previously incurred debts.  Sigmar and Reservoir point to Sigmar’s testimony
that he informed TGS that Reservoir had no capital and “a lot of debts” that
needed to be paid in order to proceed.  Sigmar and Reservoir also point to two
spreadsheets Sigmar contends were given to TGS before TGS made the $5-million
loan to Reservoir,[7]
which contained information on the past-due debt.  But Sigmar does not point us
to, and we cannot discern from the exhibits, evidence that TGS was informed of
Sigmar’s convoluted movement of money resulting in his personal payment to
himself of at least $735,000.  

            Further,
Abdallah testified that the loan was to be used for the Pemex project “going
forward” and TGS would not have loaned the money had it known its loan would be
used to pay back debts or for Sigmar to pay himself.  Also, Sigmar did not tell
Abdallah that he was going to use the loan proceeds to pay off back debts. 
Abdallah also testified that “[w]e, of course, cared about the work.  We helped
with the operations.”  Additionally, in the months after the loan was made, TGS
personnel repeatedly sought updates from Sigmar on the status of the $30
million Reservoir sought from Alliance Capital and whether the contract with
Pemex had been executed.[8] 
The parties disputed whether Sigmar adequately responded to these requests, but
the record reflects at least some evidence that TGS was quite concerned about
the status of the project and their $5-million investment in it, and the trial
court was entitled to determine the weight and credibility of this evidence.  

            TGS
also alleged that Sigmar misrepresented that he had disclosed all material
facts related to Reservoir’s financial condition, business, properties, or
prospects to TGS.  The element of materiality is determined by examining
whether a reasonable person would attach importance to and would be induced to
act on the information in determining his choice of actions in the transaction
in question.  Am. Med. Int’l v. Giurintano, 821 S.W2d 331, 338 (Tex.
App.—Houston [14th Dist.] 1991, no writ).  In the context of fraudulent
inducement, it is well established that a “representation is material if it
induces a party to enter a contract.”  Brush v. Reata Oil & Gas Corp.,
984 S.W.2d 720, 727 (Tex. App.—Waco 1998, pet. denied).  Even if a
misrepresentation is not a party’s sole inducement for entering into the
contract, it may still be material so long as the party relied on it.  Id.
at 727–28; Marburger v. Seminole Pipeline Co., 957 S.W.2d 82, 86 n.4
(Tex. App.—Houston [14th Dist.] 1997, pet. denied), disapproved on other
grounds, Hubenak v. San Jacinto Gas Transmission Co., 141, S.W.3d
172, 181–83 (Tex. 2004).

            As
discussed above, there was evidence Sigmar made several material
representations on which TGS relied.  Abdallah testified that the strong
relationships Sigmar claimed to have with the “alliance partners,” with Pemex,
and with the Mexican government were important to TGS’s decision to participate
in the Pemex project.  But, there was evidence that Sigmar misrepresented the
strength of his relationships with these entities and individuals.  The trial
court could have found that TGS would not have participated in the Pemex
project but for Sigmar’s purportedly strong contacts in Mexico and with Pemex. 
The appellants do not dispute that the purported relationships Sigmar claimed
to have were critical to TGS’s investment in the Pemex project; indeed, they
contend access to Sigmar’s contacts was TGS’s main objective.

            There
was also evidence that Sigmar’s representation regarding Reservoir’s right to
use Paulsson’s Massive 3D VSP technology was another factor that induced TGS to
invest in the Pemex project.  TGS was impressed that Sigmar had managed to
secure a contract with Pemex through his purported right to use this
technology.  Sigmar admitted at trial, however, that he and Reservoir had no
such rights.  Sigmar contends the evidence shows that Paulsson’s participation
in the project was not important to TGS because it did not care who was doing
the work and later had no objection when another company, Radil, was
substituted for Paulsson.  But Abdallah testified that “it would have mattered”
to TGS in making the loan if it had known that Sigmar’s relationships with
Paulsson was not good, and “we would have definitely questioned it.”  And TGS’s
later acceptance of Radil as a provider is not evidence that TGS did not rely
on Sigmar’s representation concerning his relationship with Paulsson at the
time it was made; Radil’s substitution was required when Paulsson refused to
provide its technology to Sigmar.

            The
trial court also could have concluded that Sigmar’s representation that he was
on the verge of securing a $30-million investment from Alliance Capital was
another material representation on which TGS relied.  In addition to the
testimony and documentary evidence, the materiality of Sigmar’s representation
that he was close to obtaining the $30-million loan is reflected in the loan
agreement, which gives TGS the right to call the Loan “due immediately if [Reservoir]
or RSM does not receive the required USD $30 million financing within sixty
(60) days” of the loan agreement’s effective date.  Therefore, the evidence was
legally and factually sufficient to support the trial court’s finding that
Sigmar made one or more material misrepresentations on which TGS relied when it
agreed to participate and invest $5 million in the Pemex project.

            There
was also evidence supporting the trial court’s findings that Sigmar knew his
representations were false when he made them and that he made the
representations with the intention that TGS act on them.  A false
representation may consist of a deceptive answer or any other indirect but
misleading language.  State Nat’l Bank v. Farah Mfg. Co., 678 S.W.2d
661, 681 (Tex. App.—El Paso 1984, writ dism’d).  False promises of future
performance also qualify as false representations which will support fraud.  Spoljaric,
708 S.W.2d at 434.  Further, a defendant who acts with knowledge that a result
will follow is considered to intend the result.  See Ernst & Young,
L.L.P. v. Pacific Mut. Life Ins. Co., 51 S.W.3d 573, 579 (Tex. 2001).  

            As
previously discussed, Sigmar’s purported right to use Paulsson’s Massive 3D VSP
technology was premised on a representation which Sigmar admitted was false
when he made it.  Having made at least one such false representation, the trial
court could have concluded that the evidence outlined above supports findings
that Sigmar’s other representations were false when made and that Sigmar
intended for TGS to make the $5-million loan to Reservoir based on these
representations.  Further, the trial court could have found that Sigmar failed
to adequately provide accurate updates and financial information regarding how
the loan proceeds were being used, and that this failure was some evidence that
Sigmar intended to secretly divert money from the Pemex project for his own use
at the time he made the representations.  See Spoljaric, 708 S.W.2d at
435.[9]  

            Finally,
Sigmar contends TGS suffered no injury by relying on his representations.  He
argues that there was no evidence Reservoir did not pay TGS back because it
used the loan proceeds on past-due debt; rather, the evidence showed that
Reservoir could not pay TGS back because Reservoir was not allowed to complete
the Pemex contract.  On these facts, however, we conclude the trial court
correctly awarded TGS damages based on Sigmar’s fraud.  The trial court could
have concluded that TGS was not merely loaning money to be repaid, but was
relying on Sigmar’s representations that TGS would be an alliance partner in
the direct-award contract with Pemex worth $30 million.[10]  There was
also some evidence that Sigmar represented that the potential existed for a
lucrative relationship with Pemex in the future, which would have been of
significant value to TGS.  Sigmar testified that “Pemex had hundreds of wells
that needed these services and we shared our financial models and proforma
projections with TGS.”[11] 
Additional evidence of the potential value to TGS of a relationship with Pemex
is found in the loan agreement, in which TGS retained a right to convert the
loan into a ten-percent-net-profits interest in the Pemex contract.  The trial
court could have found that TGS would not have included this provision in the
loan agreement if it did not believe, based on Sigmar’s representations, that
that it could potentially profit from the relationship by more than the amount
of the loan. 

            The
trial court also could have inferred from the evidence that Sigmar’s conduct in
diverting the loan proceeds to his companies and to himself personally, of
which the $735,000 was a part, instead of paying the debts owed to
participating vendors contributed to the project’s eventual failure and
ultimately the loss of a promising business association for TGS.  Thus, the
amount awarded—$735,000—represents some portion of TGS’s losses resulting from
Sigmar’s fraud.[12] 
That TGS’s damages have not been calculated with mathematical precision is not
a bar to recovery.  See O & B Farms, Inc. v. Black, 300 S.W.3d 418,
422 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); see also State v.
Buckner Constr. Co., 704 S.W.2d 837, 843–44 (Tex. App.—Houston [14th Dist.]
1985, writ ref’d n.r.e.) (“The amount of damages should be fixed by the fact-finder
in the exercise of sound discretion when the damages cannot be calculated with
mathematical certainty.”).  

            Accordingly,
we conclude the evidence is legally and factually sufficient to support the
trial court’s judgment that Sigmar committed fraud.  We overrule Sigmar’s and
Reservoir’s first issue.  

III

            In
his second issue, Sigmar contends that this case is about a suit on a note—not
fraud.  Specifically, he contends that both of the proposed theories of fraud
relate to obligations found within the terms of the contracts and the only
economic loss to TGS was the loss of payment of the note.  He also contends
that Formosa Plastics’s exception to the economic-loss rule does not
apply because there is insufficient evidence in the record that TGS actually
entered into these contracts based on the alleged representations or that any
of the representations are false.  See Formosa Plastics Corp., 960
S.W.2d at 47–48.  Further, Sigmar and Reservoir contend that by recovering both
tort and contract damages for the same injury, TGS has received
an improper double recovery in violation of the one-satisfaction rule and
should have elected its remedy.  See Waite Hill Servs., Inc. v. World Class
Metal Works, Inc., 959 S.W.2d 182, 184 (Tex. 1998) (per curiam).  

            Initially,
TGS responds that Sigmar did not object below on one satisfaction or election
of remedies and therefore may not raise these grounds for the first time on
appeal.  We agree.  See Tex. R. App. P. 33.1(a); Lake v. Premier
Transp., 246 S.W.3d 167, 174 (Tex. App.—Tyler 2007, no pet.); A.M.
Barbar Corp. v. Hellriegel, No. 09-05-077-CV, 2006 WL 2506417, at *2 (Tex.
App.—Beaumont Aug. 31, 2006, no pet.); Andrews v. Sullivan, 76 S.W.3d
702, 708 (Tex. App.—Corpus Christi 2002, no pet.); Johns v. Ram-Forwarding,
Inc., 29 S.W.3d 635, 638 (Tex. App.—Houston [1st Dist.] 2000, no pet.), disapproved
on other grounds, Glattly v. Air Starter Components, Inc., ___
S.W.3d ___, No 01-09-00098-CV, 2010 WL 3928480 (Tex. App.—Houston [1st Dist.]
2010, no pet. h.).  Because the issue has not been preserved, we do not reach
the question of whether the two awards—$5 million for breach of contract and $735,000—comprise
an impermissible double recovery by TGS.

            Turning
to Sigmar’s argument that this case involves only a suit on a note and not a
tort claim, we begin with the Formosa Plastic court’s recognition that Texas
law has long imposed a duty to abstain from inducing another to enter into a
contract through the use of fraudulent misrepresentations.  See Formosa
Plastics Corp., 960 S.W.2d at 46.  It is also well established that the
legal duty not to fraudulently procure a contract is separate and independent
from the duties established by the contract itself.  Id.  Tort damages
are recoverable for a fraudulent-inducement claim irrespective of whether the
fraudulent representations are later subsumed in a contract or whether the
plaintiff only suffers an economic loss related to the subject matter of the
contract.  Id. at 47.  Further, Texas law recognizes out-of-pocket and
benefit-of-the-bargain measures of direct damages for common-law fraud.  Id.
at 49.  The out-of-pocket measure computes the difference between the value
paid and the value received, while the benefit-of-the-bargain measure computes
the difference between the value as represented and the value received.  Id.


            As
discussed above, the evidence is legally and factually sufficient to support
the fraud finding against Sigmar.  Further, the trial court made separate
findings that Sigmar committed fraud and Reservoir breached the loan
agreement.  The trial court also awarded TGS different amounts of damages on
each cause of action.  Reservoir does not dispute that TGS loaned it $5 million
and Reservoir failed to repay the loan.  But the evidence also showed that TGS
is not a bank and was not merely lending money to Reservoir.  TGS’s fraud claim
was based on Sigmar’s additional promises of benefits that were collateral to
the repayment of the loan; namely, that TGS would become an alliance partner in
the Pemex project and reap the benefits of that association.  Sigmar’s fraud
deprived TGS of those benefits.

            Texas
courts, including this one, have permitted a recovery of both
breach-of-contract and fraud damages on similar facts.  In LJ Charter,
L.L.C. v. Air America Jet Charter, Inc., No. 14-08-00534-CV, 2009 WL
4794242, at *7–8 (Tex. App.—Houston [14th Dist.] Dec. 15, 2009, pet. filed),
this court held that Air America did not receive a double recovery for a single
injury when it was awarded $25,000 for breach of contract and separate damages
for LJ Charter’s fraudulent conduct.  In Tristan v. C.A. Walker, Inc.,
No. 13-01-410-CV, 2003 WL 21212342, at *2 (Tex. App.—Corpus Christi May 27,
2003, pet. denied), the court of appeals affirmed a judgment awarding Tristan
damages on both a breach-of-contract claim and a fraud claim when Tristan
pleaded separate theories of liability, the two theories of liability arose
from separate injuries, and each theory of liability resulted in a separate
finding of damages.

            Perhaps
most analogous is Medical Air Services Ass’n v. Kebert, 26 S.W.3d 663
(Tex. App.—Corpus Christi 2000, pet. denied).  In that case, Kebert, a sales
representative, was permitted to recover past commissions against Medical Air
Services based on breach of contract and additional commissions against Halley,
the owner of the company, based on fraud.  Id. at 668.  The court stated
that “[a]lthough the damages awarded to Kebert were for renewal commissions
lost as a result of the breach of contract, there was evidence of additional
commissions the jury could have believed were lost to Kebert because of
Halley’s fraudulent acts.”  Id. 

            Here,
TGS’s remedy for Reservoir’s failure to repay the loan compensates TGS for its
out-of-pocket loss for the loan.  TGS’s remedy for Sigmar’s fraud compensates
TGS for a portion of what it expected to receive based on Sigmar’s
representations regarding the Pemex project.  Because TGS suffered separate and
distinct injuries and damages from Sigmar’s fraud and Reservoir’s breach of
contract, the trial court did not err in awarding judgment on both causes of
action.  See LJ Charter, L.L.C., 2009 WL 4794242, at *7–8; Tristan,
2003 WL 21212342, at *2; Medical Air Services Ass’n, 26 S.W.3d at 668.

            Therefore,
we conclude that the trial court did not err in awarding fraud damages against
Sigmar and we overrule Sigmar’s second issue.  

IV

            In
the appellants’ third issue, Reservoir contends that the trial court erred in
excluding all evidence of damages on Reservoir’s counterclaims.  We review a
trial court’s evidentiary rulings for abuse of discretion.  Horizon/CMS
Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000).  

            In
an amended answer, Reservoir alleged counterclaims against TGS for tortious
interference with existing contract, conspiracy, and breach of contract.  TGS
served Reservoir with a request for disclosures and interrogatories seeking,
among other things, discovery of the damages Reservoir sought for each of its
claims.  In response to the disclosure request, which was sought before
Reservoir asserted counterclaims, Reservoir represented only that it “has not
asserted a claim for damages.”  In response to TGS’s interrogatories concerning
damages, Reservoir stated, “[Reservoir] has yet to fully quantify its damages
and will amend its response as and when appropriate.”  Reservoir never
supplemented these responses.

            On
the first day of trial, TGS filed a motion to exclude Reservoir’s evidence of
its counterclaims, including any evidence of damages.  TGS pointed out that,
after filing its counterclaims, Reservoir did not supplement or amend its
discovery or produce any calculations or expert reports on its alleged damages,
and the deadline for discovery provided in the court’s docket control order had
passed.  TGS moved to  exclude any evidence based on Rule 193.6(a) of the Texas
Rules of Civil Procedure, which provides that “[a] party who fails to make,
amend, or supplement a discovery response in a timely manner may not introduce
in evidence the material or information that was not timely disclosed,” unless
it finds that (1) there was good cause for the failure to timely make, amend,
or supplement the discovery response; or  (2) the failure to timely make,
amend, or supplement the discovery response will not unfairly surprise or
unfairly prejudice the other parties.  See Tex. R. Civ. P. 193.6(a).  

            The
trial court conducted a lengthy and detailed hearing in which it repeatedly
questioned Reservoir’s counsel about how Reservoir intended to calculate its
damages.  Reservoir was unable to articulate a coherent damage model beyond
asserting that if given the opportunity at trial, Reservoir would prove up the
value of the contracts it lost through TGS’s alleged wrongdoing, including an
amount for future contracts worth $193 million.[13]  Reservoir
also asserted that it had produced evidence of damages in the form of invoices
for approximately $9 million for expenses incurred in servicing the Pemex
contract, which it belatedly discovered and sent to TGS shortly before trial.[14]  The trial
court found that there was “definitely” no good cause for Reservoir’s failure
to timely make, amend, or supplement its discovery responses, and that
Reservoir’s failure would cause TGS unfair surprise or unfair prejudice.  She
further stated on the record:  

I find that the defendants even now cannot really tell me
exactly what you think your damages are.  You’ve got a general idea but you
cannot tell me the amount and method of calculating the damages that you’re
going to argue for at the end of this trial and I find that it’s a definite
prejudice to the plaintiffs for you not to have told them sometime before today
how you were going to figure that and the figures that you were going to use to
figure that.  So I am excluding evidence of damages for [Reservoir].

            On
appeal, Reservoir points out that its trial counsel represented below that it
had timely supplied the information through document production and through
deposition, but concedes there is nothing in the record to support this
assertion.  Reservoir also contends it made the information available in
responses to TGS’s motion for partial summary judgment.  Attached as evidence
to the responses was Sigmar’s affidavit, in which he averred that RSM had
received the first phase contract with Pemex, the total value of the contract
was going to be $193 million, and as a result of TGS’s actions, Pemex suspended
performance under the contract.  Reservoir argues that it therefore timely made
the information known to TGS, citing Rule 193.5, which provides that a party is
required to amend or supplement its discovery responses that are no longer
complete or correct “unless the additional or corrective information has been
made known to the other parties in writing, on the record at a deposition, or
through other discovery responses.”  See Tex. R. Civ. P. 193.5(a)(2).  

            The
party offering the undisclosed evidence has the burden to establish good cause or
lack of unfair surprise or unfair prejudice.  See Tex. R. Civ. P.
193.6(b); Harris County v. Inter Nos. Ltd., 199 S.W.3d 363, 367 (Tex.
App.—Houston [1st Dist.] 2006, no pet.).  Rule 193.6(a) is mandatory, and the
penalty—exclusion of evidence—is automatic, absent a showing of good cause,
lack of unfair surprise, or lack of unfair prejudice.  Lopez. v. La
Madeleine of Tex., Inc., 200S.W.3d 854, 860 (Tex. App.—Dallas 2006, no
pet.); see also Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 914 (Tex.
1992).  The purpose of this rule and its accompanying sanction is to prevent
trial by ambush.  See Aetna Cas & Sur. Co. v. Specia, 849 S.W.2d
805, 807 (Tex. 1993). 

            On
this record, we cannot say that Reservoir’s opinion of the gross value of their
contracts and some invoices equate to a damages model.  Further, Reservoir does
not explain how the gross value of anticipated contracts between RSM and Pemex
relate to Reservoir’s alleged damages.  We conclude that the trial court did
not abuse its discretion in granting TGS’s motion to exclude evidence of
Reservoir’s alleged damages on its counterclaims.  See Harris County,
199 S.W.3d at 367–69.  Further, because we have concluded that Reservoir failed
to timely provide evidence of its damages, Reservoir cannot establish any of
its causes of action.

            We
therefore overrule the appellants’ third issue.

*
* *

            We
overrule Sigmar’s and Reservoir’s issues and affirm the trial court’s judgment.

 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices Brown,
Sullivan, and Christopher.

 









[1]
A source vessel is a ship outfitted with seismic equipment used in offshore
seismic surveys.





[2]
The three shareholders in RSM were Tao Technologies, Oceantech, and Carlos
Mireles.  Sigmar owns ninety-five percent of Tao Technologies.  Erwin Larranaga
owned Oceantech. 





[3]
In a May 2006 letter, Paulsson’s president, Bjorn Paulsson, wrote to Sigmar,
“You and [Reservoir] have not had, do not have, and will not in the future have
any authority to commit [Paulsson] to any business.”  Paulsson sued Sigmar in a
Texas federal court in December 2006 and the court ordered Sigmar and Reservoir
to cease using the phrases “P/GSI” and “Massive 3D VSP.”  The court also
ordered Sigmar to send a letter to Pemex stating that Reservoir had been sued
by Paulsson and did not have authority to provide Massive 3D VSP.





[4]
Sigmar testified the remaining $3 million was put in a money-market fund.





[5]
In announcing the judgment, the trial court stated:  “I find that Mr. Sigmar’s
use of the money to pay back himself was fraudulent and that judgment should be
rendered against him for $735,000.  He has testified that he told them that he
had invested in this himself or paid money himself or something like that.  To
me, that is evidence that he was giving to TGS to show his commitment to the
project and how much he had into it, not to persuade TGS to pay him back for it
all.”





[6]
The elements of fraud by nondisclosure are (1) the defendant failed to disclose
facts to the plaintiff; (2) the defendant had a duty to disclose those facts;
(3) the facts were material; (4) the defendant knew the plaintiff was ignorant
of the facts and the plaintiff did not have an equal opportunity to discover
the facts; (5) the defendant was deliberately silent when it had a duty to speak;
(6) by failing to disclose the facts, the defendant intended to induce the
plaintiff to take some action or refrain from acting; (7) the plaintiff relied
on the defendant’s nondisclosure; and (8) the plaintiff was injured as a result
of acting without that knowledge.  See 7979 Airport Garage, L.L.C. v Dollar
Rent A Car Sys., Inc., 245 S.W.3d 488, 507 n.27 (Tex. App.—Houston [14th
Dist.] 2007, no pet.).  





[7]
The reproductions of the spreadsheets in Defendant’s Exhibit 48 are poor
quality and difficult to read.  Defendant’s exhibit 49 is entitled “Reservoir
Systems Inc. Business Plan Based on Pemex Contract – Maximum Case -2005-2007.” 
This spreadsheet is dated August 23, 2005. 





[8]
The loan agreement also required Reservoir to “[p]romptly provide [TGS] with
such other information respecting condition or operations, financial or
otherwise, of [Reservoir] as [TGS] may from time to time reasonably request.”





[9]
Thus, at the very least, the evidence is legally and factually sufficient to
support the theory that Sigmar fraudulently paid himself a portion of the loan
proceeds. 





[10]
Abdallah admitted that one of TGS’s main goals was to conduct activities in
Mexico, and that he had characterized Mexico as “the Jewel of the Nile.”  He
also testified that Mexico was the largest potential project left in the world
for anyone in the oil and gas industry.





[11]
Although the trial court sustained TGS’s objections to much of Sigmar’s
testimony concerning the value of future contracts with Pemex on hearsay
grounds, the trial court permitted this testimony for the limited purpose of
demonstrating that TGS had notice that additional contracts were expected.





[12]
The $735,000 award is for damages arising from fraud, but neither party
contends that it represents a lost-profits award.  





[13]
At one point, Reservoir’s counsel argued that there would be evidence that
follow-up contracts could have been worth up to $300 million.  The trial court
asked counsel what Reservoir was asking for, and he stated, “we’re developing
our model now but certainly at least what we weren’t paid by RSM . . . .”





[14]
The invoices presented were apparently mostly illegible.  Reservoir’s counsel
stated that they were working to enhance the copies, and the trial court
stated, “In looking at them through a magnifying glass, even with a magnifying
glass I find that [the invoices] are only partially legible.  You can kind of
guess what it says in spots.”